IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Robert Hendricks, *et al.*, | : | Chief Judge Dlott |
| | : | |
| Plaintiffs, | : | Case No. 1:10-cv-00649 |
| | : | |
| v. | : | Order Granting in Part and Denying in Part |
| | : | Plaintiffs' Motion for Class Certification |
| Total Quality Logistics, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

Before the Court is Plaintiffs' Motion for Class Certification. Doc. 223. For the

following reasons, Plaintiffs' Motion for Class Certification is **GRANTED IN PART** and

**DENIED IN PART.**[1]

I.      **INTRODUCTION**

Plaintiffs Robert Hendricks and Scott Spitler filed this action against Total Quality

Logistics ("TQL") and Kenneth Oaks[2] asserting a collective claim under the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 216(b), and a class action claim under the Ohio Minimum

Fair Wage Standards Act ("Ohio Wage Act"), Ohio Revised Code ("O.R.C.") § 4111.10.

Hendricks and Spitler were employed by TQL in positions referred to as Logistics Account

Executives ("LAEs") and Logistics Account Executive Trainees ("LAETs"). They claim that,

during their tenure as LAEs and LAETs, they were misclassified as exempt employees and

denied overtime pay in violation of the FLSA and the Ohio Wage Act. In defense, TQL

contends that LAEs and LAETs are exempt from the overtime protections of the FLSA and the

---

[1]   Also pending is Plaintiffs' Motion to Strike the Expert Report of Lloyd W. Aubry, Jr. Doc.
256. The Court found it unnecessary to rely on this report in its consideration of the Motion for
Class Certification. Consequently, Plaintiffs' motion to strike is rendered moot.
[2]   Oaks is the President and CEO of TQL.

Ohio Wage Act because they perform administrative or executive duties or because they are highly-compensated employees.

On March 17, 2011, the Court conditionally certified an opt-in class for a collective action under the FLSA. Doc. 44. Roughly 150 former employees have opted-in to the FLSA collective action. Hendricks[3] now moves for class action certification of the Ohio Wage Act claim pursuant to Fed. R. Civ. P. 23. Hendricks seeks to certify the following class:

> All inside sales employees including LAE's [sic] or Brokers and LAET's [sic] or Assistant Brokers who have worked for Defendant Total Quality Logistics LLC in the state of Ohio between September 21, 2008 and the date of final judgment in this matter.

Amended Compl. ¶ 44, Doc. 173, Page ID # 952.

## II.     FACTUAL BACKGROUND

TQL is the nation's third largest freight brokerage firm. Meizlish Decl. Ex. 3, Doc. 223-1 at Page ID # 1863. As a freight brokerage firm, TQL "sell[s] a service called truckload brokerage to companies looking to transport their merchandise over the road by truck drivers and carriers." Meizlish Decl. Ex. 1, Doc. 223-1 at Page ID # 1860. Specifically, TQL's business involves obtaining orders from customers for the transportation of freight, selling the load to a carrier, and then monitoring the shipment from pick-up to delivery. *See* Amended Compl. ¶¶ 16–17, Doc. 173 at Page ID # 948. Most of TQL's employees work in one of TQL's two Cincinnati offices. TQL also has several smaller branch offices, including offices in Dayton, Ohio and Columbus, Ohio.

On its website, TQL describes itself as "a SALES organization that operates in the logistics industry." Meizlish Decl. Ex. 1, Doc. 223-1 at Page ID # 1860 (emphasis in original).

_____

[3]   Both parties agree that Spitler is not a member of the Ohio Wage Act class and is therefore ineligible to represent the putative class.

More than seventy-five percent of the company's employees work in the sales department.  *Id*.

The sales department is divided into multiple sales teams, each of which is comprised of roughly

sixty to seventy LAEs, LAETs, and other sales support personnel.  *Id*.  Each sales team is

supervised by a Group Sales Manager ("GSM").[4]  GSMs are responsible for the overall sales

performance of the team.  Zins Dep. Ex. Z-27, Doc. 243-1 at Page ID # 3263.  GSMs are also

responsible for ensuring that LAEs and LAETs follow the company's rules and procedures; they

have authority to discipline and terminate employees.  Borkowski Dep., Doc. 223-1 at Page ID #

1919–20.  Each sales team also has multiple Sales Team Leaders ("STLs"), who are experienced

LAEs that monitor groups of five to ten LAEs and LAETs and serve as a buffer between the

team members and the GSMs.  *Id.* at Page ID # 1925; Zins Dep. Ex. Z-29, Doc. 243-1 at Page ID

# 3264.

      The proposed Ohio Wage Act class includes current and former LAEs and LAETs in

TQL's Ohio offices.[5]  Because it will be relevant to the class certification analysis, a detailed

description of each position follows.

---

[4]   A Satellite Office Leader supervises sales teams in the satellite offices.  Borkowski Dep., Doc.
223-1 at Page ID #1914.

[5]   *See* Pls.' Motion for Class Certification, Doc. 223 at Page ID #1806.  The proposed class does
not include GSMs, STLs, or any other sales support personnel.

## A. Logistics Account Executive Trainees

As the name implies, the LAET job is a training position. LAETs are taught the basics of the logistics industry by participating in formal classroom training and by working with an experienced LAE. *See* Pls.' Ex. G, LAET Job Summary, Doc. 223-2 at Page ID # 2190. The objective of the LAET position is to "earn a place on the sales floor as an LAE." Zins. Dep. Ex. Z-20, "Sales Playbook," Doc. 270 at Page ID # 4108.

### 1. Job Descriptions

TQL maintains detailed job descriptions for the LAET position, many of which are attached to the Motion for Class Certification. *See* Pls.' Ex. G, Doc. 223-2 at Page ID # 2190–94.[6] The job descriptions vary slightly, but the main duties of the position remain consistent throughout. According to the job description dated June 30, 2010, LAETs are expected to perform the following tasks:

- "Build a portfolio of clients by researching and seeking out prospects via sales calls";
- "Act as the liaison between client, carrier, shipper and receiver";
- "Develop solid relationships with clients by providing them with excellent customer service";
- "Manage the movement of the client's goods, ensuring that they are picked up, transported and delivered on time to meet or exceed the client's expectations"; and
- "Put in the time and effort to be successful on the sales floor and be recognized and rewarded with the opportunity for advancement . . . ."

*Id*. at Page ID # 2192. Additionally, LAETs are expected to "[a]ctively participate in on-going training programs, both classroom and on the job." *Id*. at Page ID # 2193.

---

[6] Exhibit G includes LAETS job descriptions dated 8/13/2008, 10/13/2009, 6/30/2010, and 2/1/2011.

## 2. Formal Training

In 2003, TQL began a formal training program for LAETs.  Borkowski Decl. ¶13, Doc. 235-2 at Page ID # 2984.  During the relevant class period (September 21, 2008 to present), TQL required that LAETs participate in a twenty-six week "rigorous Sales Management Training Program."[7]  Pls.' Ex. G, Doc. 223-2 at Page ID # 2190.

During the first eighteen weeks of the program, referred to as "LAET Logistics Sales Training," LAETs are taught the basics of the logistics industry in a formal classroom setting.[8] Pls.' Ex. X, TQL Logistics Sales Training Program, Doc. 223-4 at Page ID # 2669.  LAETs are given a corresponding manual which covers topics such as searching for and selecting available carriers, negotiating rates, making sales calls, and booking and monitoring loads.  *See* Zins Dep. Ex. Z-18, TQL Logistics Training, Doc. 223-2 at Page ID # 2074–2104.  LAETs are taught to use Load Manager, TQL's proprietary software program, which is the primary tool for managing the movement of freight.  *See* Zins Dep. Ex. Z-19, Logistics Training Facilitator Guide, Doc. 223-2 at Page ID # 2107.  LAETs are also taught basic sales and negotiation skills, with particular emphasis on selling a load to a carrier (also referred to as "covering freight" or "selling the load").  *Id*. at Page ID # 2121.  As part of their sales training, LAETs are taught to develop a pre-call plan (time spent researching a company before calling) and are encouraged to use a list of potential selling points when calling carriers.  *Id*.  LAETs are encouraged to develop and use a "sales call script" to "help ease nervousness and sell with confidence."  *Id*.  LAETs also are

---

[7]   In exceptional cases, where LAETs have prior experience in the logistics industry or extreme aptitude, TQL will allow an LAET to skip parts of the formal training.  *See* Borkowski Decl. ¶14, Doc. 235-1 at Page ID # 2984.

[8]   LAETs in the satellite offices attend "virtually" through computer access.  Deavy Dep. at 17, Doc. 223-4 at Page ID # 2618.

provided with sample responses for common objections they might hear from a carrier. *Id*. at Page ID # 2128.

After the first two weeks of training, LAETs begin their on-the-job training. LAETs are paired with an experienced LAE for "account observation" in addition to the continued classroom training. Pls.' Ex. X, TQL Logistics Sales Training Program, Doc. 223-4 at Page ID # 2669. LAETs are expected to assist the LAE with his or her accounts, which would include anything from covering or selling freight, dispatching trucks, and making "check calls," i.e., calls to a carrier to verify the progress of the load. Mills Dep., Doc. 223-1 at Page ID # 1970–72. Depending on the LAE, some LAETs are permitted to negotiate rates with carriers within a "low-high range" provided by the LAE, *see* Zins Dep. Ex. Z-19, "Logistics Training Facilitator Guide," Doc. 223-2 at Page ID # 2126, while other LAETs are not permitted to speak with the LAE's customers.

In the final eight weeks of training, referred to as "LAET Sales Training," LAETs work independent of their mentor LAE and "receive in-depth sales training that includes a mix of classroom and on[-]the[-]job training with a qualified Sales Training Specialist." Zins Dep. Ex. Z-2, Doc. 223-2 at Page ID # 2061. While the sales training in weeks one through eighteen focuses on selling a load to a carrier, the final eight weeks of sales training focuses on selling TQL's brokerage services to prospective clients. Zins. Dep. Ex. Z-19, Logistics Training Facilitator Guide, Doc. 223-2 at Page ID # 2112. Sales training is taught using a manual entitled the "Sales Playbook." *See* Zins Dep. Ex. Z-20, Doc. 270 at Page ID # 4106. The Sales Playbook provides detailed instructions on generating leads, researching potential clients, planning for sales calls, dealing with gatekeepers and voicemails, responding to objections, and quoting rates. *Id*.

LAETs complete their training and "earn a place on the sales floor as an LAE" by: (1) completing all training sessions and assignments; (2) reaching their "Weekly Sales Revenue Goals"[9]; and (3) receiving approval from their GSM.  Pls.' Ex. Y, LAET Sales Training Program Goals, Doc. 223-4 at Page ID # 2670.  Depending on the GSM, some LAETs are automatically promoted to the LAE position after their formal training ends.  Zins Dep., Doc. 223-2 at Page ID # 2034.  Some LAETs must prove that they can manage an account and generate a certain amount of revenue before they are promoted to LAE.  Bibb Dep. Ex. C, Doc. 223-1 at Page ID # 1946–47.  Still others may be terminated at the end of the twenty-six week training period if they are underperforming.  Zins Dep., Doc. 223-2 at Page ID # 2035.  Brokerage revenue is the primary performance measure.  *Id*.

### 3.  Daily Activities

Plaintiffs attached to their Motion for Class Certification a "Daily Responsibilities" schedule, which was prepared by TQL and provided to LAETs.  Pls.' Ex. H, Doc. 223-2 at Page ID # 2195.  The document provides a suggested schedule for LAETs to adhere to when they are not in classroom training.  The document instructs the LAET to engage in certain activities, often in minute detail:

| | |
|---|---|
| 7:45 AM | Startup computer, login and setup computer applications |

\* \* \*

| | |
|---|---|
| 8:00 AM | Begin Check Calls |

\* \* \*

| | |
|---|---|
| 9:30 AM | Check Calls Finished |

➢ Call Carriers that are Pre-Booked (loading today) to confirm coverage and
   prioritize dispatches

---

[9]   Each LAET has a Weekly Sales Revenue Goal.  In week one of the final eight weeks of sales training, LAETs must make 200 calls to prospective clients.  Pls.' Ex. Y, Doc. 223-4 at Page ID # 2670.  LAETs must also gain a certain number of prospects each week.  *Id*.  Revenue goals are then set at $350 for week five, $400 for week six, $450 for week seven, and $500 for week eight, totaling $1,700.  *Id*.

Call Truck Sheets

Cover Today's Loads
➢ Call carriers
➢ Negotiate rates
➢ Check all carriers on new CP/SS
➢ Set up new carriers
➢ Resolve Red Flags

Dispatch Drivers

Load Maintenance
➢ Enter loads
➢ Check Pick-up/Loading and Drop/Delivery Info
➢ Make Appointments and confirm loading and delivery hours.
➢ Continuously check the Load Program for completion and accuracy
➢ Write Comchecks (with Broker supervision)

Work on covering future freight, starting with tomorrow.

| | |
|---|---|
| 4:45 PM | Set up MGOs (Must Get Out) for trucks loading after 5:15 PM |
| 5:15 PM | |
| 5:16 PM | Completely shut down computer |

*Id.* Former GSM Keith Mills testified that although some variation exists in the day-to-day activities of LAETs, the Daily Responsibilities schedule provides an accurate view of an LAET's typical day. *See* Mills Dep., Doc. 223-1 at Page ID # 1991.

## 4. Hours and Compensation

LAETs are expected to work 60 hours per week and must be available to receive calls "24/7/365 (nights, weekends, and holidays)." Pls.' Ex, AA, "Expectations of a Logistics Account Executive Trainee," Doc. 223-4 at Page ID # 2677. In addition to their normal business hours, LAETs are scheduled for additional shifts in order to "familiarize themselves with tasks and duties of the Logistics Support team while helping with the increased call volume." *Id.*

8

LAETs are paid an annual salary of approximately $35,000, Borkowski Decl. ¶17, Doc. 235-2 at Page ID # 2985, and are classified as exempt employees under the FLSA, Pls.' Ex. G, LAET Job Descriptions, Doc. 223-2 at Page ID #2190–94.

**B. Logistics Account Executives**

After twenty-six weeks of training, many LAETs are promoted to LAEs and "enter an additional developmental period of up to 26 weeks." Zins Dep., Ex. Z-17, Doc. 223-2 at Page ID # 2072. Generally, an LAE is "an experienced TQL salesperson." Zins Dep., Ex. Z-19, Doc. 243-1 at Page ID # 3259.

**1. Job Description**

TQL maintains detailed job descriptions for the LAE position. The job description lists two primary responsibilities of the LAE: (1) "develops and manages a book of business by coordinating transportation needs for customers and providing outstanding customer service" and (2) coach and mentor LAETs during their training period. Mills Dep. Ex. 31, LAE Job Summary, Doc. 223-1 at Page ID # 2013.[10]

---

[10] The LAE Job Summary is dated July 2, 2009.

The lengthy job description provides a list of the tasks performed by an LAE. *Id.* For the sake of brevity, these tasks can be grouped into four categories: (1) tasks relating to selling TQL's brokerage services;[11] (2) tasks relating to monitoring the movement of freight and troubleshooting;[12] (3) tasks relating to documenting the sale, dispatch, delivery, and billing of a load;[13] and (4) tasks relating to coaching and mentoring LAETs and other sales support staff.[14] *Id.* The job description provides that LAEs must have "[s]trong sales and negotiation skills" and a "[d]emonstrated ability to coach and motivate others." *Id.* Additionally, LAEs "[m]ust be consistently generating sufficient business to support a LAET." *Id.*

---

[11] "Develops prospect list of potential new customers"; "Makes initial contact with customers and builds and maintains ongoing relationships"; "Increases business with customers over time"; "Negotiates rates for loads with the customer and carrier"; "Builds and maintains relationships with carriers."

[12] "Manages daily load activities by talking with carriers, customers, suppliers and vendors ensuring that goods are picked up and delivered on time"; "Acts as a liaison between the manufacturer/supplier, trucking carrier and receiver"; "Locates carriers for loads"; "Ensures that carrier is contacted at least once per day during transport, from pick-up to delivery"; "Works quickly to resolve problems that may develop on a load"; "Works with carrier and customer to resolve claim issues."

[13] "Maintains carrier spreadsheet information"; "Accurately enters and maintains up-to-date information on a continuous basis in the Dispatch Program"; "Ensures that all proper documents are completed and received by TQL before a carrier is used for the first time"; "Follows-up with carrier to keep necessary documents current"; "Ensures that all the necessary paperwork is completed and received by TQL before the first time a customer uses TQL"; "Submits appropriate paperwork to Accounting within 48 hours after a load is completed"; "Follows-up with customer if payment is not made on a timely basis."

[14] "As LAE's business grows, may coordinate work of LAET, Logistics Coordinators and/or Administrative Assistants that assist with their business. Provide direction and coaching on a regular basis. Contributes to the growth of the business by referring quality candidates into the hiring process."

## 2. Daily Activities

Generally, the LAEs who were deposed or submitted declarations in connection with the Motion for Class Certification testified that they spent most of their time prospecting, managing freight, and, in some cases, overseeing the work of LAETs and other sales support personnel. The amount of time spent on each activity appears to vary depending on each LAE's tenure and level of success.

Many of the putative class members testified that as new LAEs they spent a substantial part of their day cold-calling potential clients. *See, e.g.,* Bowlin Dep., Doc. 223-2 at Page ID # 2276 (prospected ninety percent of the time as a new LAE); Cherry Dep., Doc. 223-3 at Page ID # 2305 (prospected sixty to seventy percent of the day as a new LAE); Donner Dep., Doc. 223-3 at Page ID # 2285-86 (prospected eight to nine hours per day as a new LAE). Often GSMs directed LAEs to make anywhere from seventy-five to one hundred calls per day. *See* Foley Dep., Doc. 223-4 at Page ID # 2608 (GSM directed LAEs to make one hundred calls per day); Borkowski Dep., Doc. 223-1 at Page ID # 1930 (directed new LAEs to make a minimum of seventy-five calls per day). LAEs also are encouraged to prospect on nights, weekends, and holidays. *See* Cherry Dep., Doc. 223-3 at Page ID # 2313; Hendricks Dep., Doc. 223-3 at Page ID # 2210–11; Mills Dep., Ex. 18, Doc. 223-1 at Page ID # 2009 (email from STL encouraging LAEs to "prospect, prospect, prospect" over the Fourth of July weekend "to prove that [they] are 24/7").

As LAEs obtain more customers, they generally spend less time prospecting and more time managing freight. *See* Minton Dep., Doc. 223-3 at Page ID # 2332; Prince Dep., Doc. 223-4 at Page ID # 2574; Hendricks Dep., Doc. 223-3 at Page ID # 2210–11. However, the pressure to reach sales goals remains and, consequently, many LAEs report that they continue to devote a significant amount of time to prospecting, whether that be cold-calling or reaching out to current customers for more business. *See* Donner Dep., Doc. 223-3 at Page ID # 2287–88; Prince Dep., Doc. 223-4 at Page ID # 2575; Cherry Dep., Doc. 223-1 at Page ID # 2305 ("[E]ven when you have customers you're still prospecting them for more business.")

The amount of time spent on prospecting versus managing freight is affected by whether an LAET or other sales support personnel is assigned to the LAE. Generally, a GSM assigns an LAET to an LAE if doing so would increase the LAE's brokerage revenue. Mills Dep., Doc. 223-1 at Page ID # 1969. LAETs can perform routine duties for the LAE, such as making check calls, dispatching trucks, and covering freight. This allows the LAE to spend more time prospecting. *See id*. at Page ID # 1970. For example, putative class member Rob Inglish, who was an LAE for three months during the class period,[15] testified that he delegates many of the day-to-day freight management tasks to LAETs and LCs on his team. Inglish Decl. ¶ 6, Doc. 235-1 at Page ID # 2979. Inglish testified that he uses that time to communicate with his customers—answering questions about loads that are in transit, taking orders for future loads, and building and maintaining relationships with the client in order to secure future loads. *Id*. at ¶ 7.

---

[15] Inglish became an STL in January of 2009. Inglish Decl. ¶13, Doc. 235-1 at Page ID # 2980.

The particular type of account that an LAE works on can also influence how an LAE spends his or her time. For example, LAE Beverly Sexton specialized in oversized loads, which required a significant amount of additional service work. Sexton Dep., Doc. 235-3 at Page ID # 3088. Because these loads required additional work, Sexton testified that she was able to take on fewer customers and charge them a substantially higher rate. *Id*. at Page ID # 3091–95. This means that Sexton was able to spend more of her time servicing her customer's loads as opposed to prospecting for more work. Similarly, Leland McRoberts, an LAE who inherited a large account from his former LAE mentor, testified that he spent a majority of his time servicing that large account and didn't need to spend a great deal of time prospecting. McRoberts Decl. ¶5, Doc. 223-4 at Page ID # 2589.

### 3. Expectations

LAEs are given weekly brokerage revenue goals, which are established by the Finance Department and Sales Managers. Zins Dep., Doc. 223-2 at Page ID # 2049, 2054. If an LAE is not meeting his or her sales goals, the LAE may be coached, disciplined, or terminated. *Id*. at Page ID # 2049–50.

### 4. Hours and Compensation

Attached to the Motion for Class Certification is a document entitled "Logistics Account Executive Compensation Program," which is dated May of 2009. Zins Dep., Ex. Z-17, Doc. 223-2 at Page ID # 2072. According to that document, LAEs continue to receive a base salary once they are promoted from the LAET position. *Id*. Approximately twelve months after starting the LAET training program, LAEs are then eligible to earn commissions. *Id*. LAEs who "progress at an accelerated rate may move to a commission opportunity basis more quickly . . . with the approval of TQL management." *Id*.

13

Once the LAE is moved to a commission-based system, the LAE earns a base salary as well as additional commissions based on sales. Borkowski Decl. ¶ 18, Doc. 235-2 at Page ID # 2985. If the LAE's commission amount is higher than the base salary or "trigger point," the LAE receives the salary plus the commission. Zins Dep. Ex. Z-17, Doc. 223-2 at Page ID # 2072. If the amount of commissions is less than the trigger point, the LAE gets the base salary but the deficit becomes a forgivable draw balance which is debited against future commissions. Zins Dep., Doc. 223-2 at Page ID # 2045.

A document attached to Hendricks's reply in support of the Motion for Class Certification provides a snapshot of the brokerage compensation statistics as of July of 2011. *See* Second Meizlish Decl. Ex. 5, Doc. 243-1 at Page ID # 3330. At that time, TQL employed 939 brokers; 415 (forty-four percent) were LAETs, 272 (twenty-nine percent) were LAEs not paid commission, and 252 (twenty-seven percent) were LAEs on commission. *Id*. The annualized compensation (as of July 23, 2011) for each subset is as follows:

- LAETs: $37,070

- LAEs not paid commission: $37,974

- LAEs paid commission: $139,886

*Id*. GSM Richard Borkowski submitted a declaration in which he provided the following additional statistics:

- In 2010, the top LAE earned $479,023.60;

- In 2010, the top ten percent of LAEs earned, on average, $190,186.22;

- In 2010, the average LAE earned $63,343.34; and

- In 2010, the LAETs earned approximately $35,000.

14

Borkowski Decl. ¶ 20, Doc. 235-2 at Page ID # 2985.[16]

## III.  ANALYSIS

Hendricks asserts that TQL failed to pay LAEs and LAETs overtime wages to which they are entitled under the FLSA and the Ohio Wage Act.[17]  Because it is uncontested that TQL classified LAEs and LAETs as exempt employees and did not pay them overtime, the key issues in this case involve determining whether LAEs and LAETs are exempt from the federal and state overtime requirements under the administrative, executive and/or highly-compensated employee exemptions.  To be clear, the Court need not decide whether the exemptions apply in connection with the instant motion; rather, the central issue involves whether the applicability of the exemptions may be resolved on a classwide basis.

### A.  Class Certification

A district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).  Certification is proper "only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457

---

[16]  Updated figures for 2011 provide that the top ten percent of LAEs earned an average of $172,070.33 and the average LAE earned $46,108.32.  Miller Decl. ¶¶ 5–6, Doc. 254-1 at Page ID # 3783.

[17]  Although this motion involves class certification of the Ohio Wage Act claim, the Court will discuss only federal law on the overtime issue.  *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (The Court "need consider only federal law on [the overtime] issue, as the Ohio statute expressly incorporates the standards and principles found in the FLSA.")(citing O.R.C. § 4111.03(A)).

U.S. 147, 161 (1982)); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998) (en banc).

In addition to meeting the Rule 23(a) criteria, the proposed class must also meet at least one of the requirements listed in Rule 23(b). *Dukes*, 131 S. Ct. at 2548; *Sprague*, 133 F.3d at 397. Here, Plaintiffs seek class certification under Rule 23(b)(3) on the basis that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs have the burden of proving that the class certification prerequisites are met, *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996), and Hendricks, as class representative, is required to establish that he possesses the same interest and suffered the same injury as the class members he seeks to represent. *Dukes*, 131 S. Ct. at 2550.

Having reviewed the record, the Court is inclined to redefine and subdivide the proposed class for purposes of the class certification analysis. *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 407-08 (1980) (district court has discretion to certify subclasses *sua sponte*); *Butler v. Sterling, Inc.*, No. 98-3223, 2000 WL 353502 at *7 (6th Cir. March 31, 2000) (same). The Court will analyze whether the following two groups independently meet the Rule 23 requirements: (1) LAETs and (2) LAEs.

### 1. Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) requires as a prerequisite to a class action that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see In re Am. Med. Sys.,*

*Inc.*, 75 F.3d at 1079. While the numerosity requirement is not tied to any fixed numerical threshold, "substantial" numbers usually satisfy this requirement. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006).

The redefined proposed classes would include (1) LAETs who worked at any of TQL's Ohio offices from September 21, 2008 to present and (2) LAEs who worked at any of TQL's Ohio offices from September 21, 2008 to present. A declaration submitted by TQL's Human Resource Systems and Benefits Manager indicates that TQL employed up to 1,033 LAETs and 462 LAEs in 2011 alone. Miller Decl. ¶ 6, Doc. 254-1 at Page ID # 3783. These numbers will be larger once all former employees are included. Given the number of prospective class members, the Court concludes that the numerosity requirement is satisfied for both subclasses.

### b. Commonality

Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact common to the class." The plaintiff should be able to demonstrate the members of the class "have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551. "Their claims must depend upon a common contention" and that contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (citation omitted).

At a high level of generality, the common issue in this case is whether LAEs and LAETs are entitled to overtime compensation. TQL argues that resolving this question will require an individualized, fact-sensitive inquiry into whether each putative class member is exempt from

the overtime provisions, thus making the case ill-suited for classwide resolution. For the following reasons, the Court disagrees with respect to the LAET subclass but agrees with TQL with respect to the LAE subclass.

**_LAET Subclass._** TQL asserts that LAETs are exempt from the overtime provisions because they are administrative employees. Plaintiffs bear the burden of establishing that they can present common proof on this exemption. The administrative exemption applies to an employee if:

> (1) he or she is "[c]ompensated on a salary basis at a rate of not less than $455 per week";
>
> (2) his or her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and
>
> (3) his or her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. §541.200(a) (2011).

The parties agree that the compensation prong of the administrative exemption is satisfied. They disagree over the application of the two remaining prongs. Thus, the common contentions with respect to the LAET subclass are: (1) do LAETs primarily perform work directly related to the management or general business operations of TQL or TQL's customers; and (2) do LAETs exercise discretion and independent judgment with respect to matters of significance?

In support of the Motion for Class Certification, Hendricks produced evidence demonstrating that these common issues can be decided on a classwide basis. The evidence shows that LAETs work in an environment that is highly controlled by TQL. Most of the

LAETs' tasks are predefined in detailed job descriptions. *See* Pls.' Ex. G, Doc. 223-2 at Page ID # 2190. These descriptions define the LAETs' primary responsibilities and tasks performed. *Id*. With few exceptions, LAETs are required to participate in an extensive training program, during which they are formally instructed on how to perform their daily tasks. *See id*. Along with classroom instruction, LAETs also are provided comprehensive manuals detailing their responsibilities. *See* Zins Dep. Ex. Z-18, TQL Logistics Training, Doc. 223-2 at Page ID # 2074. TQL also provides LAETs with a Daily Responsibilities schedule that describes in minute detail the daily duties and responsibilities of job. *See* Pls. Ex. H, Doc. 223-2 at Page ID # 2195. Collectively, the job descriptions, training program, comprehensive manuals, and suggested daily schedule strongly indicates that uniformity exists in the work performed by LAETs.

The testimony from putative class members further demonstrates that the day-to-day duties and responsibilities performed by LAETs are substantially similar. The evidence shows that when LAETs are not in training they spend the majority of their time monitoring the delivery of freight and covering freight for the LAEs. *See, e.g.*, Hendricks Dep., Doc. 223-3 at Page ID # 2199; Bowlin Dep., Doc. 223-3 at Page ID # 2267-69; Donner Dep., Doc. 223-3 at Page ID # 2283; McRoberts Decl. ¶ 3, Doc. 223-4 at Page ID # 2588. When LAETs work independent of their mentor LAE, they spend their time in sales training and then begin prospecting in an attempt to reach their (uniform) Weekly Sales Revenue Goals. The Court finds that with such uniformity in the duties and responsibilities of LAETs, the parties will be able to submit common proof on the issues of whether these duties satisfy the management/business operations prong and the discretion/independent judgment prong of the administrative exemption.

In opposition, TQL cites differences in whether LAETs used sample "scripts" or their own words when calling prospects, whether LAETs were permitted to speak with and negotiate rates with their LAE's customers, and whether and how much LAETs were permitted to prospect depending on which LAE they worked with. The Court acknowledges that some factual differences exist among the LAETs; however, factual differences do not necessarily defeat commonality. *See Swigart v. Fifth Third Bank*, No. 1:11-cv-88, 2012 WL 6720562 at *5 (S.D. Ohio December 28, 2012), citing *Lee v. Javitch, Block & Rathbone, LLP*, 522 F. Supp. 2d 945, 957 (S.D. Ohio 2007) and *Laichev v. JBM, Inc.*, 269 F.R.D. 633, 640 (S.D. Ohio 2008). To defeat commonality, the differences among class members must be relevant to the exemption analysis; the Court finds it unlikely that the differences identified by TQL will affect the outcome of the legal issue.

The commonality requirement is met with respect to the LAET subclass.

*LAE Subclass*. TQL asserts that LAEs are exempt from the overtime provisions because they are administrative, executive, and/or highly-compensated employees. The administrative exemption is detailed above. The executive exemption applies to an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2011).  The highly-compensated employee exemption applies to an

employee with a "total annual compensation of at least $100,000 . . . if the employee customarily

and regularly performs any one or more of the exempt duties or responsibilities of an executive,

administrative or professional employee."  29 C.F.R. § 541.601(a) (2011).

With three exemptions at issue, the common contentions for the LAE subclass are as

follows:

- Do LAEs primarily perform work directly related to the management or general business operations of TQL or TQL's customers?

- Do LAEs exercise discretion and independent judgment with respect to matters of significance?

- Do LAEs primarily manage a department or subdivision thereof at TQL?

- Do LAEs customarily and regularly direct the work of two or more employees?

- Do LAEs have authority to hire or fire employees or particular weight with regard to recommendations on hiring, firing, advancement or promotions?

- Do LAEs make at least $100,000?

- Do the LAEs customarily and regularly perform one or more of the exempt duties or responsibilities of an executive, administrative or professional employee?

The Court finds that these contentions are not capable of classwide resolution.  Unlike the

LAET subclass, TQL has submitted evidence demonstrating that the answers to these questions

may vary from one LAE to the next, especially with regard to how LAEs spend their time in

relation to the exemptions at issue, how and when they exercise discretion in carrying out their

duties, their authority to hire or fire, and whether they direct the work of other employees.  *See,*

*e.g.*, Bowlin Dep., Doc. 223-2 at Page ID # 2276 (spent most of his time prospecting as an LAE);

McRoberts Decl. ¶5, Doc. 223-4 at Page ID # 2589 (spent most of his time servicing a single

client as an LAE); Inglish Decl. ¶ 11, Doc. 235-1 at Page ID # 2979–80 (has "substantial freedom" in exercising discretion and receives "very little interference or supervision" from management); McRoberts Decl. ¶ 11, Doc. 223-4 at Page ID # 2590–91 (exercised some discretion but only within the guidelines and restrictions established by TQL); Inglish Decl. ¶ 4, Doc. 235-1 at Page ID # 2979 (has multiple LAETs and sales support personnel assigned to him); Hendricks Dep., Doc. 235-3 at Page ID # 3036–37 (never had an LAET assigned to work for him). With all three exemptions in play, each requiring different facts to be proved, it will be impossible for the Court to resolve the exemption defenses in one stroke.

For example, putative class member Robert Inglish "earned nearly $500,000 in 2010." TQL Opp., Doc. 235 at Page ID # 2941. He spends very little time managing freight and instead focuses on tasks relating to selling TQL's brokerage services to his "established customers." Inglish Decl. ¶¶ 6-7, Doc. 235-1 at Page ID # 2979. At all times relevant, Inglish has had multiple sales support staff working under him. *Id*. at ¶ 4. TQL asserts that Inglish is exempt as an administrative, executive and/or highly-compensated employee. Conversely, within the same subclass as Inglish is the named plaintiff, Robert Hendricks. Hendricks never made over $100,000 as an LAE. He spent the majority of his time as an LAE managing freight. Hendricks Dep., Doc. 235-3 at Page ID # 3032. Hendricks never had an LAET assigned to work for him. *Id*. at Page ID # 3036-37. TQL asserts that Hendricks is an exempt administrative employee.

As this example illustrates, the applicability of all three exemptions cannot be determined on a classwide basis. With respect to the highly-compensated employee exemption, which the Court finds most problematic within the LAE subclass, the evidence shows that some LAEs earned at least $100,000 and regularly oversaw the work of two or more sales support personnel. In fact, in 2010 alone, more than ten percent of LAEs earned over $100,000. Borkowski Decl. ¶

25, Doc. 235-2 at Page ID # 2986.  And, an estimated sixteen percent of the current LAE

population has two or more assistants working under them.  *Id.*  Furthermore, the day-to-day

duties and responsibilities of LAEs appear to differ in ways that may be relevant to the

administrative and executive exemptions, especially when comparing new LAEs to more

seasoned LAEs like Inglish.  Unlike the LAET subclass, the differences among LAEs may affect

the outcome of the legal issue.

The LAE subclass cannot be certified in its current form.  However, the Court is prepared

to reconsider this decision if Hendricks is able to present evidence demonstrating that a narrower

class of LAEs can be certified.[18]  *See* Rule 23(c)(1)(C) ("An order that grants or denies class

certification may be altered or amended before final judgment.").

### c.  Typicality

The third requirement of Rule 23(a) is typicality.  Typicality is satisfied if "the claims or

defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R.

Civ. P. 23(a)(3).  The Sixth Circuit has instructed as follows regarding the meaning of the

typicality prerequisite:

> Typicality determines whether a sufficient relationship exists between the injury
> to the named plaintiff and the conduct affecting the class, so that the court may
> properly attribute a collective nature to the challenged conduct. In other words,
> when such a relationship is shown, a plaintiff's injury arises from or is directly
> related to a wrong to a class, and that wrong includes the wrong to the plaintiff.
> Thus, a plaintiff's claim is typical if it arises from the same event or practice or
> course of conduct that gives rise to the claims of other class members, and if his
> or her claims are based on the same legal theory." . . .  A necessary consequence
> of the typicality requirement is that the representative's interests will be aligned

---

[18]   For example, LAEs who are not on commission would seem to be a natural line of
demarcation: they do not earn enough to qualify for the highly-compensated employee
exemption and, the Court surmises, likely do not customarily and regularly direct the work of
two or more employees.  As with the LAET subclass, it appears that only the administrative
exemption would be relevant to this group.

with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions*, § 3-13, at 3-76 (3d ed. 1992) (footnote omitted)). The existence of defenses against certain class members does not defeat typicality. *Ross v. RBS Citizens, N.A.*, 2010 WL 3980113, at *3 (N.D. Ill. Oct. 8, 2010). "'Typical does not mean identical, and the typicality requirement is liberally construed.'" *Id.* (quoting *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996)).

The typicality requirement is satisfied as to the LAET subclass because the claims of Hendricks and the class members arise from the same practice (misclassification), affect the class members in the same manner (class members were denied overtime wages), and arise from the same legal theory (violation of the Ohio Wage Act). Any potential defenses defendants may have against particular plaintiffs do not undermine typicality. TQL plans to assert as an affirmative defense that Hendricks is an administrative employee. TQL Opp., Doc. 235 at Page ID # 2971. Assertion of this defense does not defeat typicality because the Court has already determined that the exemption defense is capable of classwide resolution.

TQL also argues that some of the putative class members will be subject to unique defenses. For example, TQL argues that putative class member Jason Brown will be subject to a lack of standing or judicial estoppel defense and that putative class member Billy Paskal will be subject to a statute of limitations defense. *Id.* at Page ID # 2972. While individual issues can preclude a finding of typicality, assertion of these defenses against two of the putative class members is not likely to "usurp a significant portion of the litigant's time and energy" such that typicality is destroyed. *See Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio

2004) (quoting *Frietsch v. Refco, Inc.*, No. 92 C 6844, 1994 WL 10014, at *3 (N.D. Ill. Jan 13, 1994).

Because Hendricks's claims are typical of those of the LAET subclass, the typicality requirement is satisfied.

### d. Adequacy

Rule 23(a)(4) requires Hendricks to demonstrate that he will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). Courts examine two criteria to determine adequacy: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Am. Med. Sys.*, 75 F.3d at 1083. Rule 23(a)(4) tests "the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977). These two requirements are met here.

TQL raises three challenges to Hendricks's adequacy. First, TQL contends that Hendricks cannot represent putative class members who may fall within the highly-compensated and/or executive exemptions. This concern has been alleviated by the creation of the LAET subclass. Second, TQL contends that Hendricks, as a former employee, cannot adequately represent current employees who may be interested in injunctive relief. This argument is unavailing, given that Plaintiffs predominantly seek monetary damages. Third, TQL raises potential credibility issues, arguing that Hendricks changed his testimony concerning the circumstances surround his resignation from TQL and that Hendricks violated restrictive covenants, which resulted in prior litigation with TQL. Although a court may consider the

honesty and trustworthiness of the named plaintiff, "'[o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.'" *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 431 (6th Cir. 2012), quoting *Pasternak v. Colonial Equities Corp./U.S.A.*, No. H-90-829 (JAC), 1993 WL 306526, at *5 (D. Conn. Feb. 10, 1993). The Court finds that Hendricks is adequately credible.

Plaintiffs submitted a declaration setting forth their attorneys' qualifications, including their experience with similar class actions and collective actions. *See* Meizlish Decl., Doc 223-1, Page ID # 1851. TQL does not challenge counsels' adequacy. The Court concludes that Mr. Meizlish and Ms. Grayson are adequate and qualified to represent the LAET subclass in this matter.

In sum, the Court finds that the numerosity, commonality, typicality, and adequacy requirements have been met with respect to the LAET subclass.

### 2. Rule 23(b)(3) Requirements

Under Rule 23(b)(3), a court may certify a class if Rule 23(a) is satisfied and if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both the predominance and superiority requirements were added to the Federal Rules "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3), Adv. Comm. Notes to 1966 Amendment). The

predominance and superiority requirements are "far more demanding" than Rule 23(a)(2)'s commonality requirement. *Id*. at 624.

### a.  Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods*., 521 U.S. at 623.  "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity Nat. Title Ins. Co*., 646 F.3d 347, 353 (6th Cir. 2011); *see also Stepp v. Monsanto Research Corp.*, No. 3:91cv468, 2012 WL 604328, at *3 (S.D. Ohio Feb. 24, 2012) (quoting *Randleman*).

There are numerous common questions of law and fact arising out of TQL's conduct to the LAET subclass making this an appropriate case for resolution by means of a class action. *See* Section III(A)(1)(b), *supra*.  The common contentions with respect to the LAET subclass are whether LAETs primarily perform work directly related to the management or general business operations of TQL or TQL's customers and whether LAETs exercise discretion and independent judgment with respect to matters of significance.  These issues can be determined based on common proof, and common questions clearly predominate in this case.

### b.  Superiority

 Rule 23(b)(3) lists a non-exhaustive list of factors to be considered in determining the superiority of proceeding as a class compared to other methods of adjudication: (1) the interests of the members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3)

the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in management of the class action. Fed. R. Civ. P. 23(b)(3).

Here, there is no evidence that the putative LAET subclass members have any interest in maintaining this litigation in separate actions. There is no record of other similar litigation against TQL. Because TQL's main offices are located in the Southern District of Ohio, it is desirable to concentrate the claims in this Court. Finally, the Court does not anticipate major difficulties in management of the class action, especially since the Court has limited the class action to the LAET subclass.

The LAET subclass meets the requirements of Rule 23(b)(3)

## III.    CONCLUSION

The Motion for Class Certification (doc. 223) is **GRANTED IN PART**. The Court certifies the following class of LAETs:

> All Logistics Account Executive Trainees who have worked for
> Defendant Total Quality Logistics LLC in the state of Ohio
> between September 21, 2008 and the date of final judgment in this
> matter.

The Court hereby appoints Robert Hendricks as class representative and his counsel, Mr. Meizlish and Ms. Grayson, as class counsel.

Plaintiffs' Motion for Class Certification is **DENIED IN PART** as to all other putative class members. The Court reserves the right to revisit the class certification issue again if Plaintiffs are able to present evidence demonstrating that a narrower class of LAEs can be certified.

Plaintiffs' Motion to Strike the Expert Report of Lloyd W. Aubry, Jr. (doc. 256) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court