**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Robert Hendricks, *et al*.,

        Plaintiffs,                              Case No.  1:10cv649

        v.                                     Judge Michael R. Barrett

Total Quality Logistics, LLC, *et al*.,

        Defendants.

**DECISION & ORDER**

This matter is before the Court following the thirteen-day bench trial held from February 15, 2022, to March 4, 2022.  The parties filed Post-Trial Briefs (Docs. 567, 569) and Responses in Opposition to the Post-Trial Briefs (Docs. 570, 571). Subsequent to this briefing, the parties filed supplemental authority.  (Docs. 575, 576).

Rule 52 of the Federal Rules of Civil Procedure provides that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58."  Fed. R. Civ. P. 52(a)(1).  In a bench trial, the Court acts as the finder of fact and is entitled to make credibility findings as to witnesses and testimony. Therefore, the Court considers among other things, the witnesses' appearance and manner of testifying, whether the witness has anything to gain or lose from the outcome of the case, does the witness give truthful answers, or rather slant testimony in its favor, is a witness's testimony supported or contradicted by other testimony or evidence that the Court found to be credible.  Based on a review of the trial testimony, exhibits, and the record in this matter, the Court hereby enters the following findings of fact and conclusions of law.

## I. **FINDINGS OF FACT**

Defendant Total Quality Logistics LLC ("TQL") is a third-party logistics provider. Defendant Kenneth Oaks has been TQL's Chief Executive Officer since he founded the company in 1997. Plaintiff Robert Hendricks is a former employee who worked for TQL as a Logistics Account Executive Trainee ("LAET") and a Logistics Account Executive ("LAE"). Plaintiff brings claims under the Federal Labor Standards Act of 1939 ("FLSA"), 29 U.S.C. §§ 201, *et seq.* and the Ohio Minimum Wage Standards Act, Ohio Revised Code §§ 4111.01, *et seq.*

Plaintiff brings his claims on behalf of himself and other employees similarly situated pursuant to Federal Rule 23(b)(3) and 29 U.S.C. § 216(b). The Court has certified two Rule 23 subclasses: (1) all LAETs who worked for TQL in the State of Ohio between September 21, 2008 and April 15, 2016; and (2) all "Junior LAEs" who worked for TQL in Ohio between September 21, 2008 and April 15, 2016. (Doc. 378). The Court also certified two § 216(b) FLSA collectives using the same definitions, but covering the time period from February 14, 2008 to April 15, 2016. (Doc. 395). Defendants have separately filed a motion to decertify the Rule 23 and § 216(b) LAET and Junior LAE subclasses and sub-collectives. (Doc. 568).

During the relevant time period, TQL provided logistics services to customers by acting as a "middle man" who connected carriers with customers. (Doc. 551, Kyle Tharp, PAGEID 109). This work was performed primarily by LAEs and LAETs. (Doc. 551, Kyle Tharp, PAGEID 109-110). LAEs earned a base salary and commission. Commission was based on a percentage of the profit TQL made on a load. (PX-54, "Logistics Account Executive Compensation Program," TOTQUAL097724) (explaining

that commission is based on a percentage of "the collected gross profit that TQL makes on a load for customers").  LAETs were in training to become LAEs.  LAETs were paid on a salary-only basis.  As to "Junior LAEs," Defendants maintain that "Junior LAE" is not a position or classification that TQL has ever used.  (Doc. 568, PAGEID 22865-22866).[1]  However, for purposes of class and collective certification, this Court designated a Junior LAE as: "a newly promoted LAE who is paid on a salary-only basis up until the point at which he or she declares or receives his or her first commission and therefore no longer is considered to be 'Junior.'" (Doc. 379, PAGEID 11307).  All LAETs, Junior LAEs and LAEs were a part of a TQL sales team led by a Group Sales Manager ("GSM").   (Doc. 560, Keith Mills, PAGEID 21911; Doc. 548, Victor Nichols, II, PAGEID 20515).

TQL has a variety of customers, including food growers, manufacturers and commodities brokers.  (Doc. 543, Kerry Byrne, PAGEID 20172).  During the relevant time period, each LAE had their own group of customers, otherwise known as the LAE's "book of business."  (Doc. 543, Kerry Byrne, PAGEID 20293).  LAEs were responsible for providing logistics services to these customers.  (Doc. 543, Kerry Byrne, PAGEID 20291).  LAEs would find customers and build their book of business by making a series of cold calls to potential customers—which TQL calls "prospecting."  (Doc. 543, Kerry Byrne, PAGEID 20172, 20294).  TQL expected all LAEs, Junior LAEs, and LAETs to prospect for customers.  (Doc. 543, Kerry Byrne, PAGEID 20294).

---

[1]Nevertheless, there are several instances in the record which show that the term was used internally.  For example, in December of 2007, TQL's Vice President of Sales informed employees that as part of a new sales training program, the TQL Sales Training Team would begin using the "Jr. LAE" designation internally for "LAEs who have not declared 100% commission" but all LAETs and LAEs should continue to use "Logistics Account Executive" on external documents and email signatures.  (PX-191, TOTAL078530).

Because TQL does not own its own trucks, it must find carriers to move its customers' goods.  (Doc. 543, Kerry Byrne, PAGEID 20172).  TQL makes its profit by moving loads of goods for customer at a price that is higher than the price it pays the carrier to move it. (Doc. 548, John Maier, PAGEID 20723; Doc. 550, Stephen Alger, PAGEID 20893).  Therefore, the goal in negotiating with carriers was to book them at the lowest possible rate.  (Doc. 544, Wesley Harrison, PAGEID 20375; Doc. 550, Richard Cooke, PAGEID 20937).

All LAETs begin their employment in TQL's training program.  (Doc. 559, Cristina Wigmore, PAGEID 21883).  For most LAETs, this training program was 26 weeks.[2] Training covered logistics and sales.  (Doc. 548, Victor Nichols, II, PAGEID 20542). Training consisted of both in-class and on-the-job training.  (Doc. 548, Victor Nichols, II, PAGEID 20569).  For the on-the-job training, LAETs were assigned to an LAE mentor and worked on their LAE mentor's account.  (Doc. 543, Kerry Byrne, PAGEID 20211, 20287).  LAETs sat next to their assigned LAE and interacted with their LAE throughout the day.  (Doc. 554, David Weiman, PAGEID 21246).  LAETs are "strongly encouraged" to work sixty hours per week, work on Saturdays, attend after-hours training shifts and be able to receive calls on nights, weekends and holidays.  (JX-2008, JX-2010, PX-28, PX-29).

As part of their on-the-job training, LAETs would help their mentors "cover" loads. (Doc. 543, Kerry Byrne, PAGEID 20346).  As several witnesses testified, the term "covering loads" encompassed various tasks but was often used interchangeably to

---

[2]Victor Nichols, who is a national sales trainer for TQL, testified that at different times TQL has used an 18-week program.  (Doc. 548, Victor Nichols, II, PAGEID 20587).  In addition, Rick Borkowski, who was a sales director for TQL, testified that each year, a small group of LAETs were able to complete their training early.  (Doc. 562, Rick Borkowski, PAGEID 22192).

describe the discrete tasks which make up the job of covering loads. For instance, "selling the load" is also referred to as "covering the load." (Doc. 543, Kerry Byrne, PAGEID 20181, 20299-20300). However, "selling the load" meant convincing the carrier to take a load and negotiating an acceptable rate. (Doc. 551, Kyle Tharp, PAGEID 21155-21156). Regardless, there is no dispute that the tasks which made up "covering the load" include those identified by Defendants: (i) building loads for customers' shipments, (ii) booking carriers, and (iii) overseeing the transportation of loads. (Doc. 567, PAGEID 22793-22803).

To build loads and book carriers, LAETs used software programs called "Load Manager" and "Carrier Maintenance." (Doc. 556, Christopher Fields, PAGEID 21652; Doc. 554, Thomas Dillingham, Jr., PAGEID 21426). These are proprietary systems which TQL has developed. (Doc. 543, Kerry Byrne, PAGEID 20234).

"Building loads" began with gathering information about the load from the customer. (Doc. 556, Joshua Mains, PAGEID 21479-21480). The information included details such as origin city, destination city and type of equipment needed. (Doc. 542, Patrick Foley, PAGEID 19916). LAETs would provide the customer with a quote on the price for moving the load. (Doc. 550, Richard Cooke, PAGEID 20974). LAETs used yet another program called "Rate Matrix" to determine the price. (Doc. 550, Richard Cooke, PAGEID 20974). Rate Matrix provided historical data on the price TQL paid for moving loads in similar shipping lanes. (Doc. 550, Richard Cooke, PAGEID 20975; Doc. 556, Christopher Fields, PAGEID 21658). However, the LAET's LAE mentor had the final say on any price quotes. (Doc. 550, Richard Cooke, PAGEID 20974).

The Load Manager program tracked which loads needed to go out each day.

(Doc. 554, David Weiman, PAGEID 21246). To find a carrier to move the load, LAETs would help "post the load," which meant posting the details about the load on third-party websites, also known as external "load boards." (Doc. 542, Patrick Foley, PAGEID 19916). Carriers who were interested in taking the load would call in, but for some loads, LAETs would have to make outbound calls to find a carrier to take the load. (Doc. 542, Patrick Foley, PAGEID 19916). If the LAET knew it was going to be difficult to find someone to take the load from a smaller city, they might post it for larger cities in order to find a carrier who would come pick it up. (Doc. 554, Thomas Dillingham, Jr., PAGEID 21435).

When carriers called in about taking the load, LAETs had a dispatch checklist they used to sell a load. (Doc. 542, Patrick Foley, PAGEID 19916-19917). LAETs would first check the Carrier Maintenance program to make sure that the carrier was approved to take the load. (Doc. 542, Patrick Foley, PAGEID 19917). Each carrier in Carrier Maintenance was scored using an internal grading system. (Doc. 554, Thomas Dillingham, Jr., PAGEID 21439). A carrier's grade was based on factors affecting performance, such as claims percentage, on-time percentage, fleet size and fallout[3] percentage. (Doc. 554, Thomas Dillingham, Jr., PAGEID 21399, 21439-21440). LAETs relied on this same grading system to find approved carriers when they had to make outbound calls to find someone to take a load. (Doc. 550, Richard Cooke, PAGEID 20966). The Carrier Maintenance program also allowed LAETs and LAEs to leave notes as to whether a carrier or particular driver was reliable. (Doc. 556, Christopher Fields, PAGEID 21587-21588). The system made it easy to determine whether a

---

[3]The term "fallout" means the carrier failed to pick up the load. (Doc. 543, Kerry Byrne, PAGEID 20305).

carrier was reliable. (Doc. 550, Richard Cooke, PAGEID 20967). LAETs were not allowed to use carriers with low grades or carriers who were not approved by TQL. (Doc. 554, David Weiman, PAGEID 21288; Doc. 554, Thomas Dillingham, Jr., PAGEID 21398).

There are Department of Transportation limitations on how many hours truck drivers can drive in a twenty-four hour period. (Doc. 543, Kerry Byrne, PAGEID 20278, 20302). There are also limitations on the weight and size of the load. (Doc. 543, Kerry Byrne, PAGEID 20302). LAETs would sometimes ask the truck driver if they had enough hours to take the load. (Doc. 554, Thomas Dillingham, Jr., PAGEID 21436-21437). LAETs would also ask the carriers if they had the right equipment to carry the load. (Doc. 550, Richard Cooke, PAGEID 20966).

When booking carriers, LAETs negotiated the rate with the carriers. (Doc. 550, Richard Cooke, PAGEID 20970). While a LAET could decide what to offer the carrier, the rate had to be within the parameters set by the LAET's mentor LAE. (Doc. 550, Richard Cooke, PAGEID 20969; Doc. 551, Kyle Tharp, PAGEID 21230-21231).

LAETs were also responsible for overseeing the transportation of loads. This included making "check calls" and problem solving any issues that arose during transit. (Doc. 542, Nicholas Newell, PAGEID 20035). "Check calls" consisted of calling the truck driver who was moving a load to check on the status of delivery. (Doc. 550, Stephen Alger, PAGEID 20893-20894; Doc. 563, Chad McMillen, PAGEID 22357-22358). Check calls were assigned to LAETs in the Load Manager program. (Doc. 542, Patrick Foley, PAGEID 19928). In the early part of their training, a LAET would need to tell their LAE mentor about any problems with the load. (Doc. 551, Kyle Tharp,

7

PAGEID 21236). Later in the training period, a LAET would only inform their LAE about more serious problems such as property damage, a claim for lost product, or if the load was going to be delivered late. (Doc. 551, Kyle Tharp, PAGEID 21236).

Some LAEs would allow their LAETs "run their account" while they were at lunch or on vacation, which meant that the LAETs would do everything that the LAEs would normally be doing. (Doc. 548, Victor Nichols, II, PAGEID 20598; Doc. 551, Kyle Edward Tharp, PAGEID 21166-21167).

After LAETs completed their training, they were promoted to the Junior LAE position. (Doc. 551, Kenneth Oaks, PAGEID 21073, 21081). Junior LAEs no longer shared a phone line or a board in Load Manager with their LAE mentor. (Doc. 548, Victor Nichols, II, PAGEID 20588). Prior to January 5, 2015, TQL required Junior LAEs to declare commission—also known in TQL parlance as deciding to "pull the plug." (Doc. 543, Kerry Byrne, 20326-20327). After January 5, 2015, Junior LAEs no longer had to declare commission but would start receiving commission as soon as their brokerage revenue exceeded their base salary. (Doc. 543, Kerry Byrne, PAGEID 20327-20328).

Junior LAEs spent most of their time prospecting for new customers. (Doc. 542, Patrick Foley, PAGEID 19943; Doc. 542, Nicholas Newell, PAGEID 20052). LAETs also prospected for new customers but spent less time doing so. (Doc. 551, Kenneth Oaks, PAGEID 21000). TQL provided detailed scripts to use while prospecting. (Doc. 542, Patrick Foley, PAGEID 20002-20003). Prospecting was governed by TQL policy. (Doc. 554, Thomas Dillingham, Jr., PAGEID 21389). To find customers, LAETs and LAEs used "Customer Maintenance," which was a database of current customers,

inactive customers and prospects.   (Doc. 543, Kerry Byrne, PAGEID 20296).   The Customer Maintenance database indicated whether a particular customer was "active." (Doc. 554, Thomas Dillingham, Jr., PAGEID 21391).  LAETs and LAEs could not pursue customers who were marked as active.  (Doc. 543, Kerry Byrne, PAGEID 20295).  In addition, LAETs and LAEs were not permitted to move certain high-value or high-theft items, such as cigarettes.  (Doc. 543, Kerry Byrne, PAGEID 20296).  While Junior LAEs had sales goals, LAETs did not.  (Doc. 542, Patrick Foley, PAGEID 19988).

The main question before this Court is whether LAETs and Junior LAEs are exempt from overtime requirements.  If they are not exempt, then this Court must determine whether TQL willfully violated the FLSA, whether liquidated damages should be awarded, and whether Defendant Oaks is subject to individual liability.

## II.  CONCLUSIONS OF LAW

The FLSA requires an employer to compensate an employee who works more than forty hours per workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  The FLSA exempts from this overtime pay requirement any employee who is employed "in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1).  Ohio's overtime statute incorporates the exemptions to the FLSA. *See* Ohio Rev. Code § 4111.03(A) ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of . . . the 'Fair Labor Standards Act of 1938'").  "Because the FLSA and the [Ohio statute] have the same overtime requirements, the outcomes will be the same and the claims

can be evaluated together." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 385 n.1 (6th Cir. 2016); *see also Roshon v. Eagle Research Group*, 314 F.Supp.3d 852, n.1 (S.D. Ohio 2018) ("Courts have uniformly held that Ohio's wage and hour law should be interpreted in accordance with the FLSA.") (quoting *Mitchell v. Abercrombie & Fitch, Co.*, 428 F.Supp.2d 725, 732 (S.D. Ohio 2006)).

## A. FLSA exemption

Establishing the applicability of an FLSA exemption is an affirmative defense and therefore, the employer has the burden to establish each element of an exemption by a preponderance of the evidence. *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007). "Although courts used to construe the exemption narrowly against the employer, the Supreme Court recently clarified that courts are to give FLSA exemptions a fair, rather than a narrow, interpretation." *Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 1:18CV2017, 2021 WL 795551, at *15 (N.D. Ohio Mar. 2, 2021) (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)); *see also Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 850 (6th Cir. 2019) ("We give FLSA exemptions a fair, rather than a narrow, reading.") (citing *Encino Motorcars*). "[T]he determination of whether an employee is exempt is an inquiry that is based on the particular facts of his employment and not general descriptions." *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 689 (6th Cir. 2001); *see also Brock v. Nat'l Health Corp.*, 667 F.Supp. 557, 565-66 (M.D.Tenn. 1987) (to ascertain exemption status it is necessary to examine closely duties and actual work performed).

Defendants maintain that LAETs and Junior LAEs are exempt from the overtime requirements because the duties they performed were administrative duties.

The administrative exemption from the FLSA overtime-pay requirement applies if the employee is one (1) who earns at least $455 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). Only the second and third elements are at issue here.

### B. **Primary duty**

An employee's "primary duty" is the "principal main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). However, time alone "is not the sole test." 29 C.F.R. § 541.700(b). Instead, the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

11

An employee's primary duty will be "directly related to the management or general business operations of the employer or the employer's customers," where the employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a). "This is often referred to as the administrative-production dichotomy, under which production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption."  *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644 (6th Cir. 2013) (citing *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004)); *see also* DOL Wage & Hour Div. Op. Ltr., 2010 WL 1822423, *3 (Mar. 24, 2010) (explaining that the dichotomy is intended to distinguish "between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'") (quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)). However, the administrative-production dichotomy is not useful in every case. *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004).  Instead, "the analogy—like various other parts of the interpretive regulations—is only useful to the extent that it is a helpful analogy in the case at hand."  *Id*. at 402-403; *see also Tsyn v. Wells Fargo Advisors, LLC*, No. 14-CV-02552-LB, 2016 WL 612926, at *15 (N.D. Cal. Feb. 16, 2016) (explaining that the administrative-production dichotomy appeared in former 29 C.F.R. § 541.205(a) which was removed from the regulations in 2004; and concluding that in the "modern service-industry context" the administration–production framework is of "little help" other than by way of analogy).

Defendants explain that TQL's business is providing "logistics services and transportation guidance." (Doc. 551, Kenneth Oaks PAGEID 21072). Defendants maintain that because TQL is not a manufacturer or producer of goods or products, the administrative-production dichotomy does not apply here. However, to the extent TQL does admittedly provide a service, the Court will rely on the administrative-production dichotomy "to the extent it elucidates the phrase 'work directly related to the management policies or general business operations.'" *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d at 403 (citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1126 (9th Cir. 2002)). As one district court has explained:

> . . . while the administrative-production distinction may be an "imperfect analytical tool" in a service-oriented employment context, employees "can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 694 (4th Cir. 2009) (citing *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997)).

*Greene v. Tyler Techs., Inc.*, 526 F. Supp. 3d 1325, 1339 (N.D. Ga. 2021).

Here, using this analogy, it is difficult for the Court to ignore the obvious conclusion that LAETs and Junior LAEs provide the very logistics service that TQL is in business to provide. However, even if the Court were to discard this analogy, the Court still concludes that TQL has failed to establish that LAETs and Junior LAEs are exempt because the primary duties of LAETs and Junior LAEs are not directly related to the management or general business operations of TQL or TQL's customers.

### 1. **LAETs**

Defendants maintain that every LAET's primary duty was covering loads. However, Plaintiffs take the position that the Court need not even engage in an analysis

of the administrative exemption for LAETs because under 29 C.F.R. § 541.705, the administrative exemption does not apply to employees training for employment in an administrative capacity. TQL points out that 29 C.F.R. § 541.705 provides that the administrative exemption does not apply to "trainees" only in a situation where they "are not actually performing the duties of an executive, administrative, professional, outside sales or computer employee." 29 C.F.R. § 541.705. In other words, trainees who perform the duties of an administratively exempt employee may still be exempt. TQL maintains that after their first two weeks on the job, most of a LAET's time was spent covering loads alongside their LAE mentors. Plaintiffs disagree and argue that LAETs spent a significant portion of their time in the classroom. Plaintiffs also maintain that employees engaged in on-the-job training are still covered under the FLSA's trainee regulation.

There is some support for Plaintiffs' position that on-the-job training can qualify as non-exempt work under 29 C.F.R. § 541.705. *See Hobbs v. EVO Inc*., 394 F. Supp. 3d 717, 736, 741 (S.D. Tex. 2019) (administrative exemption does not apply where field engineer did not handle a project as the only field engineer on site); *Espinosa v. Stevens Tanker Div., LLC*, No. 15cv879, 2017 WL 6021861, at *6 (W.D. Tex. Dec. 5, 2017) (administrative exemption does not apply where there is no evidence new dispatchers were engaged in anything but training, even if they trained alongside more experienced dispatchers); DOL Wage & Hour Div. Op. Ltr., 1994 WL 1004755, at *1 (Mar. 7, 1994) (administrative exemption does not apply to stockbrokers who undergo extended on-the-job training after completing classroom training because the exemption does not include employees who are not actually performing the duties of an

administrative employee). However, other courts have concluded that on-the-job training is insufficient to defeat an exemption if the employee is otherwise "actually performing the duties" of an exempt administrative employee. *See Ferrara v. 4JLJ, LLC*, 150 F. Supp. 3d 813, 819 (S.D. Tex. 2016).

Ultimately, the Court need not resolve this issue because as the Court has already previewed above, the Court concludes that the primary duty being performed by LAETs—regardless of whether it is couched in terms of on-the-job training or not—was not "directly related to the management or general business operations" of TQL or TQL's customers.

As the Department of Labor regulations explain, work which is "directly related to management or general business operations" is work in functional areas such as "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). As one district court has explained, these examples are "all duties clearly related to servicing the business itself: it could not function properly without employees to maintain it; a business must pay its taxes and keep up its insurance. Such are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function." *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 614 (D. Conn. 2007); *see also Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 10 (1st Cir. 1997) ("In the instant case, the activities of the

15

marketing representatives are clearly ancillary to John Alden's principal production activity—the creation of insurance policies—and therefore could be considered administrative 'servicing' within the meaning of section 541.205(b).").

While there may be some disagreement between the parties as to the amount of time LAETs spent on specific tasks, there is no dispute that the tasks which made up covering loads include: (i) building loads for customers' shipments, (ii) booking carriers, and (iii) overseeing the transportation of loads, which included making check calls and problem solving any issues that arose during transit. (Doc. 567, PAGEID 22793-22803).

Defendants maintain that LAETs are akin to the truck "dispatchers" this Court found properly classified as administratively exempt in *Wade v. Werner Trucking Co*., No. 2:10-CV-270, 2014 WL 1091707, at *23 (S.D. Ohio Mar. 18, 2014). However, the job of the dispatchers in that case is very different from the duties performed by LAETs. As this Court recognized in *Wade*, even within the dispatcher category of jobs, courts are split whether they should be exempt based on the dispatcher's duties. *Id*. at *13 (collecting cases). This Court explained that "it is fair to generalize that cases that have found dispatchers to be exempt have done so where dispatcher's duties went beyond mere communication and tracking of vehicles." *Id*. at *14. This Court noted that the primary responsibility of the dispatchers in the case before it "was overseeing truck fleets to ensure that deliveries were completed safely and on time." *Id*. at *23. As an example, the Court cited one dispatcher who posted safety notices, reminded drivers to perform their preventative maintenance and also do their quarterly safety training. *Id*. The Court found that because the dispatchers "wrote-up, counseled, or made reports

about drivers," one of their primary duties was personnel management. *Id*. The Court also found that because the dispatchers tracked DOT hours and ordered drivers to stop driving when they exceeded the hours, their primary duties included legal and regulatory compliance. *Id*.

In contrast, LAETs are not responsible for any personnel management. While there was testimony that LAETs would inquire about the number of hours a driver had available, LAETs did not have the authority to order a driver to stop driving, discipline a driver, or otherwise manage the drivers.[4] The drivers did not work for TQL. They were employed by the trucking companies hired by TQL. The trucking companies were in the business of providing trucking service. TQL is in the business of providing "logistics services and transportation guidance." (Doc. 551, Kenneth Oaks, PAGEID 21072). LAETs were not dispatching the truck drivers.[5] They were only booking truck drivers and buying trucking companies' service. In doing so, LAETs were providing the very logistics service TQL is in the business to provide. In *Wade*, dispatchers were not providing the service the trucking company was in the business to provide—truck driving. Instead, they were overseeing the truck drivers who were providing that service

---

[4]At trial, Kyle Tharp—who has worked for TQL since 2015 and currently serves as an Enterprise Operations Manager—was asked:

> . . . Does TQL control when carriers perform maintenance on their trucks?
>
> A. I don't believe so.
>
> Q. All right. And did you ever tell truck drivers when to perform safety training?
>
> A. No.

(Doc. 551, Kyle Tharp, PAGEID 21094; Doc. 563, Kyle Tharp, PAGEID 22275-22276).

[5]As one witness explained, the dispatchers working for the carriers are responsible for managing the truck drivers. (Doc. 563, Jae Minor, PAGEID 22517-22518).

for the company. As such, the dispatchers' duties in *Wade* were "directly related to management or general business operations" of their employer and the Court finds the decision in *Wade* distinguishable. *Accord Rasmusson v. Ozinga Ready Mix Concrete, Inc.*, No. 19-C-1625, 2021 WL 179599, at *12 (E.D. Wis. Jan. 19, 2021) (distinguishing cases, including *Wade*, where "the dispatchers did more than take orders and arrange for delivery; those dispatchers generally exercised supervisory or management functions over the dispatch department or and/or the drivers, and it was these functions that brought them within the administrative exemption.").

The Court also distinguishes this case from *Renfro v. Indiana Michigan Power Co.*, in which the Sixth Circuit found that the work performed by "planners" employed by an operator of power plants was administrative work. 370 F.3d 512, 518 (6th Cir. 2004). The work done by planners involved taking job orders for maintenance or new construction work which needed to be done in the power plants, and then preparing work packages to be used by workers to perform the work in the field. *Id*. at 515. In creating these work packages, the planners would "determine which plant procedures apply to the particular repairs and identify any permits necessary to allow the repairs." *Id*. In analyzing whether the planners were administratively exempt, the court noted that the "employer's principal production activity is generating electricity, and the product it offers the public is electricity." *Id*. at 518. The court determined that the planners' primary duty was "creating plans for maintaining equipment and systems in the nuclear plant." *Id*. The court found that this work was ancillary to employer's principal production activity of generating electricity. *Id*. The court concluded: "While not precisely 'administrative,' the planners' duties form the type of 'servicing' ('advising the

18

management, planning,' etc.) that the FLSA deems administrative work directly related to AEP's general business operations." *Id*. (quoting 29 C.F.R. § 541.205(b)). Here, Defendants have failed to identify any corresponding duties which are clearly related to servicing TQL's business itself.

Switching gears from its own management or general business operations, Defendants insist that LAETs served as "transportation advisors" to TQL's customers. Defendants cite to trial testimony indicating that LAETs advised TQL's customers on their general transportation operations and not just individual loads.

As far as duties which are directly related to the management or general business operations of the employer's customers, the applicable FLSA regulations provide:

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201(c). Defendants claim that in their role as advisors, LAETs checked "legal and regulatory compliance," performed "quality control," "procured" carriers to move loads for customers, "purchased" their services, "researched" market conditions, and advised customers on "safety and health." (Doc. 567, PAGEID 22837-22839). Defendants have pulled these job functions from the list in 29 C.F.R. § 541.201(b) of examples of work which is "directly related to management or general business operations."[6] However, as one federal court of appeals has recently explained: "it is not

---

[6]The Court has set forth these examples above but repeats them here for ease of reference: "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management;

enough to look only at the list of job functions under Section 541.201(b). Courts must also consider whether the employee's primary duty is contributing to the 'running or servicing of the business.'"  *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 9 (1st Cir. 2023); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) (explaining that the primary duty requirement is met "if the employee engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs.").

With regard to "legal and regulatory compliance," TQL's President, Kerry Byrne, explained that when a LAET is covering a load, a LAET needs to determine if a truck can legally haul a load for a customer.  (Doc. 543, Kerry Byrne, PAGEID 20301).  Byrne explained that in addition to the DOT's hours of service regulations, the LAET would need to know certain DOT weight and size limits, food safety regulations and California clean air laws.  (Doc. 543, Kerry Byrne, PAGEID 20302).  However, Byrne also admitted that LAETs are not working with the legal team, and "[l]egal was not their primary job." (Doc. 543, Kerry Byrne, PAGEID 20275, 20276).

Moreover, work is not considered directly related to the management or geneal business operations of the employer's customers where an employee is not doing "anything beyond engaging in their daily operational duties 'within the limits of the applicable Federal, State and Company codes and standards.'"  *Walsh v. Unitil Serv. Corp.*, 64 F.4th at 8.  Here, when LAETs were determining whether a load was legal, they were doing just that.

The same conclusion applies with equal force to the idea that LAETs were

---

human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities."  29 C.F.R. § 541.201(b).

advising customers on "safety and health." Byrne testified that "[p]art of our obligation is to make sure that freight gets moved safely and on time from Point A to Point B." (Doc. 543, Kerry Byrne, PAGIED 20321). However, there was no evidence that LAETs play a role in developing safety rules or policies which are a part of the customer's general business operations. At most, LAETs are ensuring that the truckers hired by TQL are in compliance with the previously discussed federal and state rules so that—as Byrne stated—the "freight gets moved safely and on time." As such, the performance of their work is not directly related to the management or general business operations of TQL's customers. *Accord Walsh v. Unitil Serv. Corp.*, 64 F.4th at 8 (explaining that work subject to certain compliance and safety standards is not directly related to the customer's business where the employees do not design or plan pipeline systems, nor do they analyze how they work or how they can be improved); *see also Dewan v. M-I, L.L.C.*, 858 F.3d 331, 337 (5th Cir. 2017) (explaining that in responding to an inquiry on whether background investigators fit within the FLSA's administrative exemption, a 1997 DOL opinion letter clarified that an exempt employee provides advice "on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation.") (quoting U.S. Dep't of Labor, Wage & Hour Div., Op. Letter, 1997 WL 971811, *2 (Sept. 12, 1997)).

Defendants also maintain that LAETs performed "quality control," when they took steps to ensure that a customer's goods or products were properly shipped to protect them from damage. For instance, LAETs were responsible for asking carriers if they had the right safety equipment to secure the load inside the trailers. (Doc. 563, Jae

21

Minor, PAGEID 22462-22463).  However, it was often the customer who was telling the LAET what equipment is necessary to protect the load:

> You rely usually on the shipper or receiver to dictate that. They usually won't cut the product loose unless it's, you know, secured the way they do it. They've been doing it usually longer than you or they have the experience.

(Doc. 551, Kyle Tharp, PAGEID 21119).  Therefore, for LAETs, it is typically the customer advising the LAET, not the LAET who is performing quality control on behalf of the customer.

Moreover, courts have made a distinction between quality-control work related to "production" and quality-control work related to "administration."  *Gilchrist v. Schlumberger Tech. Corp*., 575 F. Supp. 3d 761, 772 (W.D. Tex. 2021) (citing cases). "If a quality-control duty is 'functional, not conceptional' and 'relate[s] more closely to [ ] production ... than to business administration,' the FLSA exemption cannot apply."  *Id*. (quoting *Hobbs v. EVO Inc*., 7 F.4th 241, 255 (5th Cir. 2021)); *see also Dewan v. M-I, L.L.C*., 858 F.3d at 337 (concluding that the reference to "quality control" in 29 C.F.R. § 541.201(b), "particularly considering the list of which it is a part, seems to mean the quality of the mud being provided to M-I's customers and not with monitoring and adding materials to the mud as it is being used in drilling wells to ensure that its properties stay within the specifications set forth in the mud plan developed by project engineers."). Here, LAETs were responsible for ensuring that carriers were following certain rules or standards so the products being shipped would be protected from damage.  This quality control duty is a part of the logistics service TQL provides to its customers and not related to the customer's general business operations.

Next, it is undisputed that LAETs "procured" carriers to move loads for customers

and "purchased" their services.  As Byrne testified, on behalf of a customer, the LAET is:

> negotiating a rate with the carrier and agreeing to pay that rate, so it's purchasing and procurement both in that instance.
>
> Q. And are those purchasing and procurement duties part of the LAET and LAE's primary duty?
>
> A. They are.

(Doc. 543, Kerry Byrne, PAGIED 20321).

However, as the Sixth Circuit has explained: "In this circuit, the focus is on whether an employee helps run or service a business—not whether that employee's duties merely touch on a production activity." *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 995 (6th Cir. 2016).  Finding a carrier and negotiating a rate to have a customer's products shipped merely touches on a production activity.  This work is not directly related to the management or general business operations of TQL's customers.  At trial, the Court heard the testimony of Nicholas Newell, who is member of the class and now works as a transportation manager for company which is a customer of TQL. (Doc. 542, Nicholas Newell, PAGEID 20017).  He testified that TQL does not advise him on any aspect of his company's logistics operations.   (Doc. 542, Nicholas Newell, PAGEID 20082).  He explained that:

> Shipping and receiving is a small piece to our supply chain logistics puzzle.  So what we would want to do is bring somebody in and look at all of our data, from materials to, you know, production schedules, pretty much somebody to come in and look at our whole supply chain as a whole.  If you can improve some stuff on the front end, like production, maybe that's going to help the way we ship.  You know, we ship a lot of multi stock because of production issues, so really you need to see the whole picture from material to before production to shipping the final piece, which is shipping it to the customer.

(Doc. 542, Nicholas Newell, PAGEID 20082). Moreover, Newell testified that his company does not use TQL exclusively, but instead uses ten to twelve different freight brokers over the course of a year. (Doc. 542, Nicholas Newell, PAGEID 20079). Patrick Byrne, Sales Director for TQL, confirmed that when he was a Junior LAE, his smaller customers might use him exclusively to move loads, but his larger customers used him "among ten other carriers." (Doc. 565, Patrick Byrne, PAGEID 22658). Similarly, John Maier testified that his company typically uses its own box truck or a local box truck company for deliveries, but he will use TQL to find trucks once a month or once every two months "so I don't have to spend the time doing it myself. (Doc. 548, John Maier, PAGEID 20732).

At the end of the day, the "procurement" and "purchasing" duties performed by LAETs are not integral to the management or general business operations of TQL's customers. *Accord Rasmusson v. Ozinga Ready Mix Concrete, Inc.*, 2021 WL 179599, at *11 (concluding that concrete truck dispatcher's "duties of taking orders, entering them into the system, scheduling delivery, and assigning drivers to the delivery are more analogous to the work of a manufacturing production worker or a retail sales representative than to a prototypical administrative employee such as an employee in human resources or accounting."). Instead, this work is one "small piece" of the customer's supply chain.

Finally, Defendants maintain that part of a LAET's primary duty is to perform "[r]esearch into market dynamics, research into the customer's business, research into the availability of capacity in any area that the customer may need it, would be a few examples." (Doc. 543, Kerry Byrne, PAGIED 20321). This work is akin to the work of

the employees in *Su v. F.W. Webb Co.*, which the court found did not qualify for the FLSA's administrative exemption. No. 20-CV-11450-AK, 2023 WL 4043771, at *10 (D. Mass. June 16, 2023).

In *Su*, the employees were inside sales representatives ("ISRs"). Id. at **1-2. Because the employer's business purpose was to "produce wholesale sales of its products to its customers," and the ISRs' primary duty was to help sell those products, the court concluded that the ISRs' primary duty was closely related to the employer's business purpose. *Id*. at *9. The court explained that even if it accepted the employer's characterization of the ISRs' primary duty—providing solutions to its customers by advising customers on product selection, assisting customers with ongoing projects, advising customers on design and specifications, assisting customers in preparing proposals, and formulating sales strategy by providing general managers with information about competitors—the ISRs only did these things in order to facilitate the sale of products. *Id*. The court added that "ISRs here all make discrete sales, and thus their work is not akin to the more administrative role of promoters or marketers who work to promote sales generally." *Id*. (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 905 (3d Cir. 1991)). Even though there was evidence that the ISRs "spend much more time on helping customers, doing in-depth research on their needs, and finding the associated available products than on completing orders," the court explained:

> Be that as it may, the goal of their research is to provide customers information about which Webb products they should purchase. These ISRs may be experts, but they are experts whose primary function is helping to sell Webb products. This logic applies equally to the work ISRs do to help customers even when sales do not occur. While Webb hopes that a byproduct of the ISRs' giving advice may be that it promotes and

preserves relationships with future customers, the ISRs' primary intention for giving that advice is for it to lead to sales.

*Id*. at *10 (citations omitted).  The Court finds that the advice that LAETs gave customers is no different.  Any research LAETs performed into market dynamics, a customer's business or a customer's potential needs was to promote future sales.[7] LAETs were not performing work which was a part of the management or general business operations of TQL's customers.  *Accord Greene v. Tyler Techs., Inc.*, 526 F. Supp. 3d 1325, 1343 (N.D. Ga. 2021) (concluding that time spent reviewing client information and becoming familiar with their policies does not meet the standard of advising a customer on its general business operations as contemplated by 29 C.F.R. § 541.201(c)).  One witness at trial confirmed as much.  When asked if TQL is advising customers on how to run their business, Patrick Byrne, Sales Director for TQL, responded:

 . . . We are not advising them on how to run their business.  We are giving them useful information.  Based on their understanding of transportation, we may have to give them more education and consulting than other customers.  It could be high-level, market-driven data to a high-level customer that's going to benefit from having that, or it could be a customer that doesn't know the difference between a flatbed and a dry van.  So very high-level education, also very low-level education is being done.  But no, we're not going to our customers telling them how to run their business.

Q. Right. And the hope ultimately, you said, is to get more loads -- isn't that right? -- from that customer?

A. Yes, to build trust and build a partnership where we're consulting you on your business and helping you move your freight. That's our model.

---

[7]The Court recognizes that LAETs were not directly responsible for making sales.  While most LAETs did not have their own customers until they started prospecting as Junior LAEs, LAETs understood success at TQL was dependent on sales.  Victor Nichols, a national sales trainer for TQL explained: "As an LAET myself, I chose to stay after work as I was approaching my proving ground period, and I made prospecting calls because our account was just too busy during the day.  (Doc. 548, Victor Nichols, II, PAGEID 20687).

(Doc. 565, Patrick Byrne, PAGEID 22655).

To summarize, Defendants have not identified work performed by LAETs which is "directly related to management or general business operations" of TQL or its customers. Moreover, the Court notes that under the FLSA regulations, "[f]actors to consider when determining an employee's primary duty include, but are not limited to . . . . the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). Evidence was presented at trial that Defendants classified Logistics Support Specialists (LSSs) as nonexempt. (PX 39). LSSs worked night shifts and on the weekends, but like LAETs, they also covered loads. (Doc. 559, Portia Kabler, PAGEID 21819). This included negotiating with carriers, performing check calls and handling any problems which might arise with the delivery. (Doc. 559, Portia Kabler, PAGEID 21819-21821). This evidence confirms for the Court that LAETs do not qualify for the FLSA's administrative exemption.

### 2. Junior LAEs

Defendants maintain that the principal dispute regarding Junior LAEs was how much time any individual class member spent prospecting for customers versus providing logistics services. However, Defendants take the position that both aspects of the job were administratively exempt, so it is irrelevant how much time any individual spent prospecting versus on logistics.

While Junior LAEs did provide logistics services, the testimony at trial established

that their primary duty was to sell TQL's freight brokerage services.[8]  Typically, when Junior LAEs started out, they did not have any customers.  Junior LAEs were trying to grow their book of business by finding new customers.  As one witness testified at trial: "My most important duty as a Junior LAE was prospecting, trying to grow a book of business, cold calling."  (Doc. 554, David Weiman, PAGEID 21259).  Junior LAEs would make between sixty and one hundred calls a day.  (Doc. 544, Wesley Harrison, PAGEID 20480-20481; Doc. 554, Thomas Dillingham, Jr., PAGEID 21393; Doc. 544, Wesley Harrison, PAGEID 20480).  Several witnesses testified that the majority of their time as a Junior LAE was spent prospecting.[9]  For example, one former employee

---

[8]Defendants have taken the position that when providing logistic services to TQL's customers, Junior LAEs performed the same work as LAETs.  Defendants cite the same job functions from the list in 29 C.F.R. § 541.201(b): "legal and regulatory compliance," "quality control," "procurement," "purchasing," "research" or "safety and health." (Doc. 567, PAGEID 22836-22839).  However, for the same reasons the Court found this work performed by LAETs was not "directly related to management or general business operations" of TQL's customers, the Court finds the same rationale applies to Junior LAEs.

[9]Defendants maintain that providing logistics services was a crucial part of the job for Junior LAEs. That may be true, but Junior LAEs would not have loads to move if they did not prospect for customers.  While the amount of time prospecting versus providing logistics services shifted once Junior LAEs landed customers, a Junior LAE would still spend at least half of their time prospecting.  At trial, Patrick Byrne, Sales Director for TQL testified:

> Q. Well, I'm trying to get a sense of what your day-to-day responsibilities would have been as a Junior LAE. You told us that 95 percent when you started out would have been prospecting, right?
>
> A. Right.
>
> Q. And then at some point you start getting loads, so some of your obligation now is to move loads, not prospect?
>
> A. Right.
>
> Q. So now we're up to 30 loads a week.
>
> A. Right.

testified:

> Q. All right. When you were a new LAE, so while you were salaried only, what duty did you perform the most?
>
> A. Prospecting, because I didn't have any customers.
>
> Q. Okay. So what percentage of your time do you think you spent prospecting?
>
> A. You know, a hundred percent initially.
>
> Q. Initially. And then throughout the time frame of you being a Junior LAE, how much overall do you think you prospected –
>
> A. If I took that whole time, it was still probably 85 percent of the time because, you know, I started to get customers, so I had to work on loads, but I didn't have very many.
>
> Q. So you're saying for the time frame that you were a Junior LAE, you estimate about 85 percent of the time you were prospecting?
>
> A. Yes.

(Doc. 542, Nicholas Newell, PAGEID 20052). A current employee testified:

> Q. I think you said 57 percent of your time as a noncommissioned LAE was spent prospecting, trying to find customers?
>
> A. To start, yes.
>
> Q. And so that's your primary focus as an noncommissioned LAE, is to build your business?
>
> A. Yes.

(Doc. 556, Joshua Mains, PAGEID 21558-21559). Finally, another former employee

---

> Q. How much time are you spending during those weeks moving loads rather than prospecting?
>
> A. Got it. I would say -- I mean, I was probably working 50- to 60-hour weeks during the time where I'm moving 30 loads. Half your time is spent managing that business. The other half is still spent lead generating and prospecting.

(Doc. 565, Patrick Byrne, PAGEID 22620).

testified:

> Q. And how much time did you spend on a daily basis calling customers as a Trainee? I'm sorry, as a Junior LAE.
>
> A. The majority of the day.

(Doc. 548, John Maier, PAGEID 20718).

In addition, the Court finds it significant that TQL monitored the number of prospecting calls made by Junior LAEs and the amount of time spent on these calls. (Doc. 565, Patrick Byrne, PAGEID 22635).  Furthermore, Junior LAEs were evaluated based on the amount of sales they made as a result of these calls.  One TQL document titled "TQL Training Program Overview" labels the first four weeks as an LAE as the "Sales Proving Ground" and explains "this is your opportunity to apply the sales skills learned during Core Sales Training.  You are expected to reach $1,500 in sales revenue during this four week period."  (PX-75).  Another training program document with the heading "Sales Training Program Goals" shows how to "Earn a Place on the Sales Floor" by meeting weekly numbers for calls, new prospects and revenue figures.  (PX-69, TOTQUAL098825).  If Junior LAEs could not meet these goals, they were terminated.  (Doc. 548, John Maier, PAGEID 20729; Doc. 554, David Weiman, PAGEID 21260).[10]  One GSM testified that the turnover rate for the Junior LAEs he supervised

---

[10]Witnesses testifying on behalf of TQL attempted to down-play this reality.  Thomas Dillingham, Jr. testified that as a GSM he did not terminate two LAEs who did not meet their sales goals, but he would have terminated the LAEs if they were not working hard or trying to get better.  (Doc. 554, Thomas Dillingham, PAGEID 21380-21381).  Patrick Byrne, Sales Director for TQL, testified similarly:

> . . . over time if you were consistently not putting in the effort and not putting up the revenue, there would be conversations to improve that behavior.  Then eventually we would put that person on goals.  You know, we would give someone a few months potentially, but if they're not giving us effort, at some point we would put them on goals, which are usually a four-week plan to improve

was approximately sixty percent. (Doc. 563, Chad McMillen, PAGEID).[11] This illustrates that selling TQL's freight brokerage services is the "principal main, major, or most important duty that the employee performs." *See* 29 C.F.R. § 541.700(a). Therefore, the Court concludes that the primary duty of Junior LAEs was making sales.

Another district court has already found that prospecting on behalf of an employer who operates a business as a logistics advisor and shipping broker is not "directly related to management or general business operations". *Koehler v. Freightquote.com, Inc*., No. 12cv2505, 2015 WL 4203962, at *5 (D. Kan. July 10, 2015). As part of its business, the employer "advise[d] its customers on available shipping solutions and then arranges shipments with carriers to meet customer needs." *Id*. Like TQL, the employer's:

> business involves two steps. First, customers agree to ship their products using Freightquote's services. Second, Freightquote finds carriers who will ship the products according to Freightquote's customers' needs. Essentially, Freightquote is a middle-man—it makes money when customers pay Freightquote more than Freightquote pays the carriers who

---

> effort, generate revenue. It could be effort based. It could be performance based. It's some sort of plan down on paper to where if these things aren't met at that point after four weeks, we would part ways.
>
> Q. Right. At four weeks, that person would be terminated if they did not meet their goals?
>
> A. Correct. But, again, we would -- there would be several conversations prior to the point of putting somebody on official goals setting expectations around effort and what's expected day to day.

(Doc. 565, Patrick Byrne, PAGIED 22636-22637). In addition, there is evidence from TQL's own records confirming that LAETs were terminated for not meeting revenue goals. Laura Kramer, who was working as a HR Specialist for TQL at the time, acknowledged that she responded to a request for unemployment benefits from the state and explained that the employee was a Junior LAE who was terminated for not meeting her sales goals of $1700 for revenue. (Doc. 542, Laura Kramer, PAGEID 19872; PX-346, TOTALQUAL10194).

[11]This figure is supported by internal TQL documents. (PX-322, TOTALQUAL061794-95).

actually transport the load.

*Id*. at *19.  The parties sought summary judgment on the administrative exemption for three different job families: Account Representative/Freight Broker, Customer Activation, and Truckload Coverage.  *Id*. at *17, 19.  While the court found that there was a genuine issue of material fact as to the employees' primary duty, the court found that some of the employees' duties are production related.  *Id*. at *21.  For instance, the Account Representative employees called potential and existing customer to prospect for business.  *Id*.  The court explained that "[t]his type of sales activity relates directly to producing services that are the primary output of plaintiff's business—connecting customers with carriers—and therefore is not administrative."  *Id*.  As to the Truckload Coverage employees, the court explained:

> It is undisputed that the "principal function" of the Truckload Coverage family of positions is to find and negotiate a carrier to move a truckload for a customer at the lowest possible cost.  Freightquote is in the business of connecting its customers with shippers. By booking carriers to transport customers' loads, Truckload Coverage employees are necessary to produce the service that Freightquote provides. This function is not accounting, marketing, or other typical administrative work "applicable to the running of any business."

*Id*. at *24 (quoting *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009)).

In reaching its decision, the *Koehler* court relied on the Third Circuit's opinion in *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir.1991) *cert. denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992).  This Court finds this opinion instructive as well.[12]  In *Martin*, the employer's primary business was selling electrical products.

---

[12]Defendants point out that in *Martin* the Third Circuit applied DOL regulations which were amended in 2004.  As one district court has explained, the current regulations differ significantly:

The employees were inside salespersons who spent the majority of their time making telephone sales of electrical products. *Id*. at 902. The sales were made primarily to contractors, industrial buyers, institutions and government organizations. *Id*. A small percentage of inside sales were made to individual consumers. *Id*. Most of the goods sold were from the employer's in-house inventory, but when a particular item was not in stock, an inside salesperson would negotiate the cost of the goods directly with the

---

The *Martin* regulations defined work "directly related to management policies or general business operations" as limited to employees performing "work of substantial importance to the management or operation of the business." The modern version of this portion of the regulations, updated on April 23, 2004, dropped the "substantial importance" requirement. Instead, the new regulations spell out a more expansive administrative exemption:

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a). *Martin*'s holding concerning the "substantial importance" portion of the administrative exemption, therefore, is potentially inapposite to the text of the current regulation at issue in this case. 940 F.2d at 905–06.

*Smith v. Johnson & Johnson*, No. CIV A 06-4787, 2008 WL 5427802, at *8–9 (D.N.J. Dec. 30, 2008). However, after reviewing analysis of the changes to the regulations in *Roe v. Debt Reduction Servs., Inc*., No. CV-05-0330-FVS, 2007 WL 1266151, at *3 (E.D. Wash. Apr. 30, 2007) and guidance from the DOL itself in *Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed.Reg. 22,122, 22,138 (Apr. 23, 2004), the court concluded:

> It is apparent, therefore, from *Roe*'s analysis and from the regulatory body's analysis of its own rules, that some substantial effect on the greater business affairs of the employer is required for the administrative exemption to apply, and that the second holding of *Martin* should still guide this Court's analysis of the administrative exemption, though the new regulations do not contemplate that administrative employees are solely those in top management and policy positions.

*Id*. at *10. Moreover, the rules change does not affect the first holding of *Martin*: that the salespersons were not "administrative" employees. This is the holding relied upon the court in *Koehler* and relied upon by this Court.

manufacturer and then negotiate the selling price to the customer requesting the goods. *Id*. at 903.

The Third Circuit held that the district court properly determined that the inside salespersons were production rather than administrative employees. *Id*. at 903. The court noted that the employer's primary business purpose was to "*produce sales* of electrical products and therefore "[i]t follows that Cooper's inside salespersons may be classified as 'production' rather than 'administrative' employees." *Id*. at 903 (emphasis in original). The court rejected the argument that the inside salespersons were performing administrative work when they "serviced" the employer's business by representing, negotiating, purchasing, and promoting sales on his employer's behalf:

> Cooper's inside salespersons do not 'service' Cooper's business enough to justify a finding that they are administrative employees within the meaning of 29 C.F.R. § 541.205(a) & (b). Even though inside salespersons may sometimes "negotiate," "represent the company" and "purchase" on Cooper's behalf when customers request products not already in Cooper's stock-in-inventory, these are not their primary duties.

*Id*. at 904. The court explained that making routine wholesale sales is not administrative in nature just because the sales inevitably involved some price and terms negotiations with customers; but instead, these activities were "part and parcel" of the activity of "producing sales." *Id*. Therefore, the court found:

> inside salespersons do not "service" Cooper's business by making wholesale sales—wholesale sales is Cooper's business. Any negotiation and representational duties undertaken by Cooper's inside salespersons in the course of ordinary selling do not constitute administrative-type "servicing" of Cooper's wholesale business within the meaning of 29 C.F.R. § 541.205(b). These activities are only routine aspects of sales production within the context of Cooper's operation.

*Id*. at 905. The court also rejected the argument that the inside salespersons were administrative employees who "promote sales." *Id*. The court explained that the

salespersons were not promoters or marketers; and even if they occasionally advised customers of additional products and negotiated on behalf of the company to make a sale to a particular customer, "such selling efforts in the context of discrete, particularized sales transactions do not constitute 'administrative' work." *Id.*

Similarly, other courts have found that "the work performed incidental to sales should be also be considered sales work." U.S. Dep't of Labor, Wage & Hour Div., Op. Letter, 2010 WL 1822423, *5 (Mar. 24, 2010) (citing *Pontius v. Delta Financial Corp.*, No. 04-1737, 2007 WL 1496692, *9 and n.20 (W.D. Pa. Mar. 20, 2007)).[13]   For example, in *Wilburn v. Topgolf Int'l, Inc.*, the district court found that an event sales manager was "performing sales tasks, not administrative tasks" while seeking out corporate or large-scale clients and booking their events at the employer's dining and sports gaming venue. 461 F. Supp. 3d 320, 331 (E.D. Va. 2020). The court explained:

> Topgolf argues that Wilburn was engaged in advertising, marketing, and public relations, each of which is an example of administrative work identified in the regulation. *See* 29 C.F.R. § 541.201(b). In support of this argument, Topgolf cites to Wilburn's business development activities, such as cold calling potential customers, serving as Topgolf's point of contact for some customers, and her involvement in resolving client issues which arose during the execution of events. But each task identified by Topgolf and recited above, with the single exception of running the meetings, is consistent with the general role of a sales representative in a retail or service establishment. Because the regulation distinguishes such sales from work that is "directly related to the management or general business operations," despite the fact that sales necessarily involves aspects of advertising, marketing, and public relations, Topgolf cannot recharacterize the work Wilburn does to its advantage here. 29 C.F.R. § 541.201(a). Wilburn's work, unlike administrators in advertising, marketing, and public relations, is dependent on a buyer. *Cf.* 29 C.F.R. § 541.203 (identifying examples of the administrative exemption and noting that in the context of financial services industry employees, "an employee whose primary duty is selling financial products does not qualify."). And while there is no

---

[13]This 2010 Administrator's Opinion Letter also discusses with approval two Sixth Circuit cases: *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574 (6th Cir. 2004) and *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394 (6th Cir. 2004).

dispute that Wilburn never contributed to marketing campaigns or developing ads, the evidence here merely shows Wilburn's attempts to create targeted, personal interactions between herself and a single Topgolf customer or potential customer, albeit institutional customers.

*Id*. at 330-331.[14]   The court explained that "[t]he complained-of tasks are not administrative, but sales-related."  *Id*. at 331.

In contrast, in *Swartz v. Windstream Commc'ns, Inc.*, the Third Circuit found that requirement two of the administrative exemption was satisfied in a case involving a sales engineer who custom-designed telecommunications platforms for his employer's clients:

> Windstream is a telecommunications provider; its business is to sell telecommunications systems.  Swartz did not sell these systems himself. Rather, he assisted with the sales by custom-designing telecom systems to meet each prospective customer's unique needs.   In this manner, Swartz's primary duty constituted work that serviced Windstream's core business—the sale of telecom systems.

429 F. App'x 102, 105 (3d Cir. 2011).

Defendants argue that some sales positions can be exempt if the primary duties of the position go beyond mere sales.  Defendants argue that the type of strategic sales planning done by Junior LAEs while prospecting is an administratively exempt duty.

---

[14]The court explained more specifically:

• Seeking new customers is intrinsically intertwined with sales, because sales only occur if one has a buyer;

• Sellers maintaining contact with clients is a natural consequence of the relationship where buyers make requests and pay for services;

• A salesperson's job is only complete if a customer pays, and;

• Ensuring the product is delivered as requested and paid for is both a part of executing a previously-made sale, and increasing the likelihood of a future sale by creating a return customer.

461 F.Supp.3d at 331.

Defendants rely on two Sixth Circuit cases to make this point: *Perry v. Randstad Gen. Partner (US) LLC*, 876 F.3d 191 (6th Cir. 2017) and *Burton v. Appriss, Inc.*, 682 F. Appx. 423 (6th Cir. 2017).

In *Perry v. Randstad Gen. Partner (US) LLC*, the employer was a staffing company. 876 F.3d 191, 194 (6th Cir. 2017). The Sixth Circuit analyzed whether several positions fell within the administrative exemption. However, based on the arguments presented by the parties in that case, the focus of the analysis was whether these positions required the exercise of discretion and independent judgment. *Id*. at 209, 210. As another district court has observed, "the border between administrative and production work does not track the level of responsibility, importance, or skill needed to perform a particular job." *Koehler v. Freightquote.com, Inc.*, No. 12-CV-2505-DDC-GLR, 2015 WL 4203962, at *23–24 (D. Kan. July 10, 2015) (quoting *Davis v. J.P. Morgan Chase & Co*., 587 F.3d 529, 532-33 (2d Cir. 2009)). The amount of discretion an employee has is relevant to the third prong of the administrative exemption test, "[b]ut they have less bearing on the issue whether an employee's function may be classified as administrative or production-related." *Id*. (citing *Davis*, 587 F.3d at 532–33 n. 4); *see also Su v. F.W. Webb Co*., 2023 WL 4043771, at *9 (citing *Martin v. Cooper Elec. Supply Co*., 940 F.2d at 903-904, 906 ("The fact that ISRs bring with them knowledge and expertise, and are allowed to exercise discretion in setting pricing, does not transform the sales-focused function of their role.")). Therefore, the Court finds that *Perry* provides little guidance in determining whether the primary duty of Junior LAEs was administrative or production-related.

The second case cited by Defendants—*Burton v. Appriss, Inc.*—is also

distinguishable.  That case dealt with an account manager employed by a software services company.  682 F. App'x 423, 425 (6th Cir. 2017).  The Sixth Circuit affirmed the district court's conclusion that the employee qualified for the administrative exemption.  The Sixth Circuit noted that the employee was responsible for "develop[ing] a clear and thorough strategic sales plan for each account by using business analysis tools to identify and track revenue trends, recognize sales opportunities, target specific sales activities, and analyze competitive threat."  682 F. App'x 423, 425-26.  The Sixth Circuit also noted that even though the job entailed the selling of the employer's products to existing customers, "this was undisputedly a subpart of her primary duty, *i.e.*, to manage relations with, support, service, and be a liaison to, existing clients regarding their computer software needs."  *Id.* at 427-28.  The Sixth Circuit explained that it was undisputed that sales only occupied one-third of an account manager's time.  *Id.* at 428.  The Sixth Circuit acknowledged that time is not the "sole test" under the FLSA regulations, but "[t]hat only one-third of the total time Burton devoted to her otherwise exempt account-manager responsibilities was occupied by arguably non-exempt upselling efforts is thus a factor that—albeit not unimportant—falls short of tending to show her primary duty was nonexempt."  *Id.* at 428.

Here, there is no evidence that Junior LAEs developed strategic sales plans for customers using business analysis tools.  Instead, the testimony at trial was that Junior LAEs spent the majority of their time prospecting for clients.

The Court also distinguishes the work performed by Junior LAEs from that of the crane dispatcher in another case cited by Defendants: *Rock v. Ray Anthony Intern.*, *LLC*, 380 F. Appx. 875 (11th Cir. 2010).  In that case, the crane dispatcher's primary

duties included: customer communication, choosing the appropriate crane for specific jobs, assigning operators to cranes, overseeing other employees, preparing and reviewing job tickets, maintaining the crane rental schedule as well as selecting the type of materials, supplies, machinery, equipment, and tools to meet the customers' needs. *Id.* at 878.  Both the district court and the Eleventh Circuit concluded that given the amount of time the crane dispatcher spent on managerial duties, his primary duties went beyond mere sales.  *Id.*  Instead, his primary duty was the "management" of the employer's crane rental division.  *Id.*  The Eleventh Circuit explained that this conclusion aligned with its earlier decision in *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004), in which the court determined that "even when employees engage in sales, their duties are administrative if the majority of their time is spent advising customers, hiring and training staff, determining staff pay, and delegating matters to staff."  *Id.* Here, Defendants have not identified similar managerial duties performed by the Junior LAEs.

A Junior LAE's work is also distinguishable from employees who spend their time marketing and promoting the employer's products or services generally.[15]  For instance, in *Schaefer–LaRose v. Eli Lilly & Co.*, the Seventh Circuit found that pharmaceutical representatives who "neither produce the employers' products nor generate specific

---

[15]A opinion letter from the DOL discussing the application of the administrative exemption to mortgage loan officers, notes that the preamble to the 2004 Final Rule to the FLSA regulations emphasized "the difference between employees who have a primary duty of sales and employees who spend the majority of their time on a variety of duties such as promoting the employer's financial products generally, deciding on an advertising budget and techniques, running an office, hiring staff and setting their pay, servicing existing customers (by providing insurance claims service), and advising customers."  Opinion Letter Fair Labor Standards Act (FLSA), 2010 WL 1822423, at *4 (Mar. 24, 2010) (69 Fed. Reg. at 22145-46). The same distinction can be applied more broadly to other employment positions, including the job of Junior LAE in this case.

sales but service the production and sales aspects of the business by communicating the employers' message to physicians" were administratively exempt.  679 F.3d 560, 576-77 (7th Cir. 2012).  The court explained:

> The current regulations themselves provide an illustrative list of "functional areas" or departments from which employees frequently qualify for the administrative exemption; that list includes such areas as advertising, marketing and public relations.  29 C.F.R. § 541.201(b).  Although none is a perfect description of the work of the representatives here, they are sufficiently similar to suggest that the representatives' work is directly related to the general business operations of the pharmaceutical companies.  The representatives here are the principal ongoing representatives of the company to the professional community that is in a unique position to make, or deny, a viable market for the company's product.  They do not make individual sales of medications, but ensure, on a continuing basis, that the medical community is fully aware of the potential of the company's pharmaceutical products and that the same community is confident that the company's products will be effective tools in the practical setting of a medical practice.  Moreover, the representatives are one of the principal, and perhaps the main, conduit by which physicians provide meaningful feedback to the company on the actual effectiveness, and limitations, of the product.

*Id*. at 574-75.  In contrast, Junior LAEs are only making individual sales.  Their work does not include the type of advertising, marketing or public relations which could be said to be directly related to the general business operations of TQL.

To summarize, the primary duty of Junior LAEs was selling TQL's logistics services.  Their work did not extend beyond mere sales and was not "directly related to management or general business operations" of TQL or its customers.  Therefore, Junior LAEs do not qualify for the FLSA's administrative exemption.

**C.** **Exercise of discretion and independent judgment**

Even if Defendants were able to establish that the primary duties of LAETs and LAEs were administratively exempt, Defendants must also prove that the employee's primary duty "includes the exercise of discretion and independent judgment with respect

to matters of significance." 29 C.F.R. § 541.200(a)(3).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The term "matters of significance" relates to the "level of importance or consequences" of the employee's work. *Id*. The FLSA regulations identify factors to consider, including:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). Generally, employees exercising discretion and judgment are free from immediate supervision and their decisions may or may not be reviewed at a higher level. 29 C.F.R. § 541.202(c). However, the exercise of discretion and independent judgment must be "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

Defendants maintain that LAETs and Junior LAEs were entrepreneurs who ran their own business. (*See* Doc. 551, Kenneth Oaks, PAGEID 21070). Defendants

41

explain that LAETs and Junior LAEs were free to select any specific industries they wanted to find new customers; and during prospecting calls, they were free to say whatever they wanted to prospective customers.  Defendants also point out that when they were covering loads, LAETs and Junior LAEs had discretion in building loads, planning routes and ensuring drivers could meet the DOT hours of service regulations. Defendants explain that LAETs and Junior LAEs also made judgments about the proper equipment to use and the reliability of carriers.  Defendants explain that after posting the load and finding a carrier, LAETs and Junior LAEs would negotiate rates with carriers. Finally, Defendants explain that LAETs and Junior LAEs would make check calls and solve any problems during shipment.

Defendants have largely overstated these responsibilities.  Even if LAETs and Junior LAEs were permitted to exercise discretion and independent judgment, none of these matters were "matters of significance" according to the factors listed in 29 C.F.R. § 541.202(b).  For example, building a load was generally "data entry where we put in basic details like load weight, equipment type, shipper, receiver information, phone numbers, et cetera, and any customer specific PO numbers that would be assigned with that load."  (Doc. 563, Jae Minor, PAGEID 22427).  If there was missing information, a LAET could track that information down from the customer.  (Doc. 565, Craig Svellinger, PAGEID 22711).  Determining the route was "pretty much" just "plugging it into PC Miler and getting their route."  (Doc. 563, Jae Minor, PAGEID 22429).  "PC Miler" is a tool commonly used in the logistics industry and works like Google Maps for truck routes. (Doc. 548, Victor Nichols, II, PAGEID 20620).

When prospecting for customers outside of TQL's database, Junior LAEs used

"Google. Google Maps. . . . [and] other websites out there that, you know, provide lead lists for different manufacturers."  (Doc. 563, Jae Minor, PAGEID 22488).  Before calling a prospect for the first time, Junior LAEs spent a few minutes "googling prospect[s], reviewing their website, and looking them up in load manager."  (Doc. 559, Cristina Wigmore, PAGEID 21864).

Moreover, in addition to the general parameters governing their decision-making,[16] LAETs and Junior LAEs were not free from immediate supervision and most of their decisions were reviewed at a higher level.  When they are hired, LAETs sign an acknowledgement of TQL's "Expectations of a Logistics Account Executive Trainee," which states that "TQL constantly tracks a number of sales performance metrics" and that a LAET "can expect to receive on-going coaching and to be measured on their performance on a constant basis."  (JX-2008).

When booking a carrier, TQL provides LAETs with a checklist of questions to ask the driver:

> So when you're dispatching a truck in our system, you have to go through a checklist on the right-hand side of the screen, and you ask the driver a litany of questions. It's, you know, can you scale 48,000 pounds, do you have straps or load locks to secure the load, and they verbally answer yes, I do, on all of these boxes as you go down and work your way to the bottom.

(Doc. 551, Kyle Tharp, PAGEID 21119).

When it came to negotiating with carriers, some LAEs gave their LAETs price ranges for the quotes provided to the carriers.  (Doc. 542, Patrick Foley, PAGEID 19921; Doc. 542, Nicholas Newell, PAGEID 20029).  Other LAEs would provide price

---

[16]It was undisputed that certain TQL policies and procedures governed which carriers could be used, which customers were approved to do business with and which commodities could be moved.  (Doc. 559, Portia Kabler, PAGEID 21814-21815).

ranges in certain circumstances.  (Doc. 563, Chad McMillen, PAGEID 22341; Doc. 563 Jae Minor, PAGEID 22434).  For example, Cristina Wigmore testified that her LAETs kept her looped in on decisions made regarding a "day-of load or a high-value, large-margin load."  (Doc. 559, Cristina Wigmore, PAGEID 21873).

LAETs participated in a highly structured training program designed to enable them to meet their sales goals.  LAETs were instructed to follow a specific sales process and given a daily schedule to follow so that they could reach "their sales potential."   (JX-2004,   TOTQUAL097771;   JX-2002,   TOTQUAL013440, TOTALQUAL013453).  When they first started out making prospecting calls, some LAETs and Junior LAEs used the scripts they were given during their training.  (Doc. 559, Cristina Wigmore, PAGEID 21865).[17]  In addition, LAETs were seated next to their LAE mentors and the LAEs were monitoring the decisions made by LAETs.  (Doc. 563, Jae Minor, PAGEID 22536).  TQL tracked the number of prospecting calls, the duration of the calls, and recorded phone calls so they could be reviewed by supervisors.  (Doc. 544, Wesley Harrison, PAGEID 20411, 20416).

Therefore, the Court concludes that even if Defendants were able to establish the second element of the administrative exemption, Defendants could not establish the third element because they have not shown the primary duties of LAETs and Junior LAEs includes the exercise of discretion and independent judgment with respect to matters of significance.

The Court holds that Defendants violated the FLSA and the Ohio Minimum Wage

---

[17]Once LAETs and Junior LAEs began to learn what worked, they developed their own way of making prospecting calls.  (Doc. 559, Cristina Wigmore, PAGEID 21865).  However, some LAETs and Junior LAEs never used scripts.  (Doc. 563, Chad McMillen, PAGEID 22379).

Standards Act in failing to compensate Plaintiffs for hours worked beyond forty hours per week.

## B. Willfulness

Under the FLSA, the statute of limitations for a claim seeking unpaid overtime wages is generally two years. 29 U.S.C. § 255(a). However, if the claim is one "arising out of a willful violation," the statute of limitations is extended to three years. *Id*.[18]

To show a willful violation of FLSA, an employee must demonstrate "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 129 (1988).[19] The plaintiff bears the burden of proving an employer's willfulness. *Frye v. Baptist Mem'l Hosp., Inc*., No. 07-2708, 2011 WL 1595458, at *9 (W.D. Tenn. Apr. 27, 2011), *aff'd*, 495 F. App'x 669 (6th Cir. 2012) (citing *Lemaster v. Alt. Healthcare Solutions, Inc*., 726 F.Supp.2d 854, 866 (M.D.Tenn. 2010)).

The Sixth Circuit has "held that a violation of the Act was willful where undisputed evidence showed that the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his

---

[18]"In contrast, Ohio law provides for a two-year statute of limitations for claims based upon unpaid overtime compensation, but does not provide for an extension in the case of a willful violation by the employer." *Claeys v. Gandalf, Ltd*., 303 F. Supp. 2d 890, 893 (S.D. Ohio 2004) (citing Ohio Rev. Code § 2305.11).

[19]As one district court has explained:

a finding of willfulness is dispositive of the liquidated-damages issue," since proof of willfulness precludes a showing of good faith. *Herman [v. Palo Group Foster Home, Inc.]*, 183 F.3d at 474 [(6th Cir. 1999)]. But "the reverse is not necessarily true," as a conclusion that an employer did not act in good faith can still be reached even if an employer's violation was merely negligent and not willful. *Elwell [v. Univ. Hosps. Home Care Servs]*, 276 F.3d at 842 n. 5 [(6th Cir. 2020)].

*Abadeer v. Tyson Foods, Inc*., 975 F. Supp. 2d 890, 908 (M.D. Tenn. 2013).

assurance of future compliance with the FLSA.'" *Herman v. Palo Group Foster Home, Inc*., 183 F.3d 468, 474 (6th Cir.1999) (quoting *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 967 (6th Cir. 1991)). "[C]ourts within the Sixth Circuit have generally found the willfulness standard met where there is evidence in the record that the employer actually knew that its conduct violated the FLSA or was placed on notice that its conduct might violate the statute, whether by prior Department of Labor investigations, by prior complaints or lawsuits brought by employees, or otherwise." *Brooks v. Tire Discounters, Inc*., No. 3:16-cv-02269, 2018 WL 1243444, at *8 (M.D. Tenn. Mar. 8, 2018) (collecting cases). Other "[c]ourts across the country have found the following evidence sufficient to support an inference of willfulness: '(1) admissions that an employer knew its method of payment violated the FLSA prior to the accrual of the action; (2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA; (3) earlier violations of the FLSA that would put the employer on actual notice of the [r]equirements of the FLSA; (4) failure to keep accurate or complete records of employment; and (5) prior internal investigations which revealed similar violations.'" *Patterson v. O'Bar Wrecker Serv., LLC*, No. 1:22-CV-051-H, 2023 WL 5004417, at *5 (N.D. Tex. July 31, 2023) (citing *Bingham v. Jefferson County, Tex*., No. 1:11-CV-48, 2013 WL 1312563, at *14 (E.D. Tex. 2013)). Prior settlements have also been held to be relevant to the willfulness determination. *Greene v. Tyler Techs., Inc*., 526 F. Supp. 3d 1325, 1352 (N.D. Ga. 2021) (collecting cases).

Here, Plaintiffs have presented similar evidence of actual knowledge based on earlier violations or notice that TQL's classification might violate the FLSA. Defendants were certainly aware that overtime claims had been brought against other freight

46

logistics companies, including a 2002 lawsuit against TQL's number one competitor, C.H. Robinson. (Doc. 543, Kerry Byrne, PAGEID 20183; Doc. 551, Kenneth Oaks, PAGEID 21031-21032). The misclassification claims against C.H. Robinson were covered in the media and discussed internally at TQL in 2009. (PX-226). In addition, Kerry Byrne, President of TQL, explained that proper classification was discussed among the companies in the logistics industry: "everyone that I'm aware of in the industry that has similar positions to ours classify them as exempt. But, you know, people have done -- people having been challenged on it, and people have done reviews as well. So it's talked about from time to time." (Doc. 543, Kerry Byrne, PAGEID 20334). TQL itself was challenged in December of 2013 when a former LAET brought claims on behalf himself and others similarly situated under the FLSA and Florida law. *Daza v. Total Quality Logistics, LLC*, No. 8:13-cv-3259 (M.D. Fla.).[20] Plaintiff claimed that he was misclassified as exempt. No. 8:13-cv-3259 (M.D. Fla. Sept. 29, 2015) (Doc. 93). In February of 2016, the court approved a settlement of the case which provided for unpaid overtime compensation, liquidated damages, and attorneys' fees and costs. No. 8:13-cv-3259 (M.D. Fla. Sept. 29, 2015) (Doc. 112). In September 2016, another complaint was filed by a former employee against Defendants claiming violations of the FLSA's overtime requirements. *Craig v. Total Quality Logistics, LLC*, No. 8:16-cv-2970 (M.D. Fla.) (Doc. 2). The court granted Defendants' Motion to Compel Arbitration. No. 8:16-cv-2970 (M.D. Fla.) (Doc. 23). Eventually, in late 2017, the arbitrator entered an award for the plaintiff; and the parties filed a stipulated dismissal on February 21, 2018. (No. 8:16-cv-2970 (M.D. Fla.) (Docs. 31, 33,

---

[20]While the claims were filed as a collective and class action, only one opt-in plaintiff joined the action and the court later granted Defendants' Motion to Deny Collective and Class Certification. No. 8:13-cv-3259 (M.D. Fla. Sept. 29, 2015) (Doc. 84).

35). Finally, on July 19, 2016, approximately 140 former LAETs and LAEs employed outside Ohio brought FLSA claims against TQL for misclassifying them as administratively exempt. *Hudgins et al. v. Total Quality Logistics*, No. 1:16-cv-7331 (N.D. Ill.) (Doc. 1). This lawsuit remains pending and active.

In addition, TQL was subject to two investigations conducted by the Wage and Hour Division of the U.S. Department of Labor.[21] In June of 2017, the DOL investigated TQL's Columbus, Ohio office for misclassifying LAEs as administratively exempt. (PX-356). The period under investigation was June 13, 2015 to June 14, 2017. However, the investigator recommended that the case be dropped because the class action in this case was pending against TQL. (PX-356). In 2018, the DOL investigated TQL's Tampa, Florida office for misclassifying LAEs as administratively exempt. (PX-357, HENDRICKS0054). The period under investigation was September 13, 2016 to September 11, 2018. (PX-357, PAGEID0071). The findings of the investigation indicated that LAETs and LAEs were nonexempt because they did not exercise discretion and assist management in the general operation of the business. (PX-357, HENDRICKS0055, HENDRICKS0072-73). The report on the investigation states that during a second-level conference with inside and outside legal counsel, counsel was willing to "concede on the time the LAEs spent on training, but after the training period, their position will be that the LAEs will be exempt." (PX-357, HENDRICKS0075-76). TQL requested that the DOL suspend all enforcement actions pending the outcome of this case and the *Hudgins* case pending in the Northern District of Illinois. (PX-357, HENDRICKS0054). Upon the recommendation of the DOL Assistant District Director

---

[21]In ruling on a Motion in Limine filed by Defendants (Doc. 487), the Court found that the reports from these investigations were admissible but would be given limited weight. (Doc. 537, PAGEID 19834).

assigned to the case, the DOL closed the file to allow these lawsuits "run their course" and conserve agency resources.  (PX-357, HENDRICKS0054).

These lawsuits and investigations would have put Defendants on notice that their continued practice of treating LAETs and Junior LAEs as exempt might violate the FLSA.  However, the lawsuits and investigations were initiated after the accrual of this action or cover periods of time beyond the timeframe of the class and collective in this action.  Therefore, for purposes of this lawsuit only, the Court must conclude that there is inadequate evidence of willfulness; and the statute of limitations for unpaid overtime wages is limited to two years.

**C. <u>Good Faith</u>**

The FLSA provides that liquidated damages be awarded for FLSA violations in an amount equal to the actual damages, 29 U.S.C. § 216(b), but a court may in its discretion refuse to award these liquidated damages "if the employer demonstrates good faith and reasonable grounds for believing it was not in violation."  29 U.S.C. § 260.  This burden on the employer is "substantial" and requires "proof that [the employer's] failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict."  *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (quoting *McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971)).  To prove that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions."  *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 at 908)).  "Good faith" means more than

merely not willfully misclassifying the employee.  *Id*. (citing *Elwell*, 276 F.3d at 841 n. 5).  Rather, "[t]he employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith."  *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 856 (6th Cir. 2019) (quoting *Martin v. Ind. Mich. Power Co*., 381 F.3d 574, 584-85 (6th Cir. 2004)).  It is also important to note that "[a] finding that defendant's actions were not willful does not preclude a finding that defendant did not act in good faith and on reasonable grounds."  *Johnson v. Big Lots Stores, Inc*., 604 F. Supp. 2d 903, 926 (E.D. La. 2009) (citing *Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1274 (11th Cir. 2008) (explaining that "[b]ecause the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present.")).

Defendants maintain that TQL undertook several steps to ascertain whether its classification of LAETs and Junior LAEs was correct: (1) performing an internal review in 2005; (2) consulting with a trade association; (3) asking other freight brokers how they classified their employees; and (4) conducting an analysis of its job positions by hiring a third-party consultant with experience in FLSA audits.  While these constitute affirmative steps to ascertain the FLSA's requirements, Defendants have not carried their burden of demonstrating reasonable grounds for believing TQL was not in violation.

The initial decision on how to classify LAETs and Junior LAEs was made by Oaks.  (Doc. 551 Kenneth Oaks, PAGEID 21021).  Oaks made his decision based on guidance from the Transportation Intermediaries Association ("TIA"), a trade

organization for freight brokers, and conversations he had with others in the industry during a TIA convention.  (Doc. 551 Kenneth Oaks, PAGEID 21022-21023).  However, "good faith cannot be established merely by conforming with industry standards."  *Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895, 903 (N.D. Ohio 2006) (collecting cases), *aff'd*, 249 F. App'x 441 (6th Cir. 2007); *see also Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58 (2nd Cir. 1997) (good faith is not "demonstrated by the absence of complaints on the part of employees or simple conformity with industry-wide practice.").  Therefore, any reliance on industry practices is on weak footing.  Moreover, as explained above, Oaks admitted that other freight brokers had been challenged on the classification of their employees, and TQL's classification of LAETs was challenged in the *Daza* lawsuit in 2013.

While Defendants maintain that they took other affirmative steps to determine the proper classification of their employees, this evidence also falls short of establishing that they acted in good faith.  Defendants explain that in 2005, TQL's Vice President of Human Resources, Eric Grothaus, conducted a review of the FLSA classifications for the LAET and LAE positions.  Then, in 2012, TQL hired Candra Bryant as a consultant to review TQL's classification of all of their positions.  Plaintiffs claim Bryant was hired as an employee, not an outside consultant.  Regardless of her relationship with TQL, the Court gives little weight to her review, or the review conducted by Grothaus.  As this Court has observed: "Although the Sixth Circuit has observed that 'caselaw usually cites discussions with attorneys or government officials as evidence of good faith,'" there is "no authority showing that the circuit has extended that reasoning to consultations with human resources."  *Hardesty v. Kroger Co.*, No. 1:16-CV-298, 2020 WL 7053358, at *9

(S.D. Ohio Dec. 1, 2020) (quoting *Sec'y of Labor v. Timberline S., LLC*, 925 F.3d at 857).

Here, Defendants do not cite to discussions with attorneys or government officials. Grothaus did not testify at trial, and Oaks testified he could not remember whether lawyers were involved in determining the proper classification of their employees. (Doc 551, Kenneth Oaks, PAGEID 21079). Bryant also did not testify at trial. While Defendants maintain that Bryant had experience in conducting FLSA audits, Bryant's credentials and knowledge of the FLSA were never established. Furthermore, the Court was not presented with the details of her review or her findings beyond Oaks' recollection that he was informed that "we were in line with what the laws are." (Doc. 551, Kenneth Oaks, PAGEID 21080). This fails to satisfy the good faith standard under the FLSA, which "is more stringent than it is in many other contexts." *Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895, 902 (N.D. Ohio 2006), aff'd, 249 F. App'x 441 (6th Cir. 2007) (citing *Martin v. Indiana Michigan Power Co.*, 381 F.3d at 584). These vague references to FLSA reviews without supporting documentation are not enough to establish that Defendants acted in good faith. *Id.* Therefore, pursuant to 29 U.S.C. § 216(b), Plaintiffs are to be awarded liquidated damages in an amount equal to the actual damages.

### D. Individual liability

Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Sixth Circuit has explained that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an

employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 965 (6th Cir. 1991) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). As its CEO, Defendants do not dispute that Kenneth Oaks is individually liable to the extent TQL is found liable. (Doc. 570, PAGEID 23004, n.2).

III. **CONCLUSION**

Based on the foregoing, Plaintiffs' Motion for Judgment pursuant to Fed. R. Civ. P. 52 (contained within their Proposed Findings of Fact and Conclusions of Law) is **GRANTED** as to all claims. Defendants are liable to Plaintiffs under the FLSA and the Ohio Minimum Wage Standards Act; Plaintiffs are entitled to an award of liquidated damages; and Plaintiffs' claims are subject to the FLSA's two-year statute of limitations.

In light of these rulings, the parties are directed to meet and confer and file a joint submission outlining the briefing schedule for the remaining issues of (1) damages, (2) pre- and post-judgment interest, and (3) costs and reasonable attorney's fees.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT